## R. LEE HALL ET AL. *vs.* MARY E. HALL.

*Fraud—Family Settlement—Confidential Relations—Collusive Agreement.*

Where the parties interested in an intestate's estate, having the capacity to contract, enter into a family settlement dividing the estate in a way different from that in which the law would divide it, a court of equity, favoring the amicable adjustment of family affairs, has no concern with the relative generosity of the actors, nor with the terms of settlement, and will not relieve the contracting parties from what they have stipulated unless the contract is voidable for fraud.            p. 186

He who bargains in matters of advantage with a person placing confidence in him is bound to show that a reasonable use has been made of that confidence.            p. 191

The widow of an intestate, who made a settlement with his children and his grandchild, by which she accepted as her portion less than her statutory share, with a stipulation that the grandchild should receive only a sum named, she making the settlement merely because it conformed to the intestate's wishes, *held* entitled to have the settlement set aside on the ground of fraud, it appearing that there was an agreement, unknown to her, by which the children were to pay to the grandchild a considerable sum in excess of that named in the settlement, and that the widow acted without independent action and in reliance on the good faith of the children, with whom her relations were friendly.            pp. 188-193

The right of the widow to set aside the settlement for fraud was not affected by the fact that she had received a check on account of her share thereunder, since this was before her discovery of the collusive agreement, and she could account for the amount thereof as a credit on her share of the estate.
p. 193

*Decided January 21st, 1925.*

Appeal from the Circuit Court for Dorchester County, In Equity (BAILEY, J.).

Bill by Mary E. Hall against R. Lee Hall and others. From a decree for plaintiff, defendants appeal. Affirmed.

The cause was argued before URNER, ADKINS, OFFUTT, DIGGES, BOND and PARKE, JJ.

*George H. Myers,* with whom was *A. Stengle Marine* on the brief, for the appellants.

*Fredk. J. Schlosstein* and *Wm. N. Andrews,* with whom was *Jas. S. Shepherd* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

When John W. Hall married a second time on November 25th, 1915, both he and his bride had children by former marriages. No other children were born to him, and when he died intestate on March 9th, 1922, he was survived by his wife, the appellee, and four sons, the appellants, and a granddaughter, who were his sole legal representatives. He was buried on Sunday, March 12th, and the next day the widow, Mary E. Hall, and his four children, R. Lee Hall, J. Keifford Hall, E. Roy Hall and Ralph W. Hall, and a granddaughter, Elizabeth R. Hall, the only child of his son, William C. Hall, who died before the intestate, met and entered into a purporting family settlement, which was later successfully assailed by the widow on the ground of fraud. The sons have brought this appeal in order to have reviewed the action of the court in avoiding the settlement by which (a) the widow waived both her claim to administer and her right to take one-third of the estate, and agreed instead, after the payment of the sum of $500 to the intestate's brother, Robert H. Hall, and the deduction of the necessary expenses and allowances, exclusive of any commissions to the administrator, to accept as her full share of the intestate's estate the one-fifth part of the funds coming into the hands of the ad-

ministrator, after the arbitrary addition thereto of $1,200 and the subtraction therefrom of $1,000; and assigned all other remaining interest in the estate to the four sons, share and share alike; and (b) the granddaughter agreed that her father's debts should be deducted from her distributive share in her grandfather's estate and to accept of the residue of said share the sum of $1,000 as her sole portion, assigning any amount left to the said four sons, share and share alike; and (c) J. Keifford Hall waived commissions as administrator on the estate, and (d) all the parties agreed that the judgment of the intestate against J. Keifford Hall should not be accounted for at the amount recovered, but be treated as being for the reduced amount of $3000 in the settlement of the estate.

As the intestate left an estate of both real and personal property whose value was charged in the bill of complaint, and admitted by the answer of the appellants to be from forty to sixty thousand dollars, against which there was but little to be deducted by way of indebtedness, the division under the settlement widely and substantially diverged from the provisions of law which allotted one-third of the whole net estate to the widow, and the remaining two-thirds in five equal shares to every one of the four sons and the granddaughter. The parties, however, were the owners of the subject matter, and had capacity to contract, and in the division of their property a court of equity, favoring the amicable adjustment of family affairs, has no concern with the relative generosity of the actors, nor with the terms of settlement, and will not relieve the contracting parties from what they have stipulated unless the contract is voidable for fraud.

An extended analysis of all the testimony will not be attempted, but the conclusion of the court as to what was established by the proof will be briefly stated. The court finds that several weeks before his death John W. Hall and his son, J. Keifford Hall, went through the father's private papers and discussed the disposition of his estate, and shortly after this the father sent to his attorney, A. Stengle Marine,

Esq., written instructions for the making of his will. Mr. Marine prepared the will and took it to the residence of John W. Hall on March 7th, where Mr. Marine remained for some time, but left without the will having been approved or executed, but with the understanding that he was to return later in the week, which was prevented by Mr. Hall's death two days later. J. Keifford Hall was acting as the intermediary between his father and Mr. Marine; and, after his father's death, but before the burial, he took possession of the safe in which his father's private papers were kept and removed the safe from the home to the bank, where it was kept unopened until the appraisement.

While it is denied by the widow, it must be taken as established that, at a conference on Saturday afternoon at which she, J. Keifford Hall, his wife, his brothers, Ralph W. Hall and E. Roy Hall were present, it was agreed that, because of his knowledge of the intestate's estate and of his friendship for J. Keifford Hall, Mr. Marine would be asked to come down on Monday to advise what should be done towards quickly settling the estate. An engagement was made by telephone with Mr. Marine, who inquired if the widow knew he was to come, and he was informed that it was at her suggestion.

The burial was on Sunday. J. Keifford Hall and E. Roy Hall stayed with the widow, and the next morning they were joined by Ralph W. Hall, another son, Elizabeth R. Hall, the granddaughter, and a little later by Dr. R. Lee Hall, the fourth son, and Mr. Marine, so that about ten o'clock in the morning the entire family and the attorney were together at the home. After some general conversation the widow was told by Mr. Marine and J. Keifford Hall that her husband had wished to have J. Keifford Hall settle his estate, and had intended to give his granddaughter, Elizabeth R. Hall, the sum of one thousand dollars only, and equally to divide the rest among his four sons and his wife, as he did not consider she was entitled to more than a child's portion. The widow testified that, the day after her husband's death,

J. Keifford Hall told her the estate was about $30,000, but she did not recall the discussion on that subject on Monday at the meeting, but all the sons did, and said that she and they concurred in estimating the value of the estate at about $35,000, while Mr. Marine testified it was approximated to be at the least $35,000, and from $35,000 to $40,000.

Upon his understanding that the amount of the estate was about $35,000, and knowing that the widow wished to have the matter of her interest in the estate settled as soon as possible, in order that she might return to her former home in Baltimore, Dr. Hall opened the negotiations with the widow by offering her $5,000 in cash for her share. He reached this amount by deducting $5,000 for the expenses of administration, and dividing the $30,000, so as to give the widow, every one of the sons, and the granddaughter, $5,000 each. The widow declined this proposal, and Dr. Hall inquired what was her suggestion. She replied that she would be willing to share equally with the four boys, provided the granddaughter should receive only the sum of $1,000, and that if the granddaughter would not be willing to accept this amount, she would apply for letters of administration, settle the estate, charge the regular commissions, take her full one-third part of the estate, and then give the granddaughter her legal share; and add together her share, her commissions and the legal shares of the four sons and divide the aggregate equally among herself and the sons. The widow left the room while her proposal was being considered, and returned shortly to state that her offer should be modified by the additional requirement that the sum of $1,200 be added to the amount for distribution among her and the sons, and then $1,000 be deducted therefrom, and the residue should be equally apportioned so as to give her one-fifth thereof.

The granddaughter declined to agree to this settlement, and asked to talk to Dr. Hall privately. The two went out of the room and this was what occurred between them, as narrated by Dr. Hall: "We talked the matter over, and believing as I did that Elizabeth was entitled to her father's

part of the estate, had he been living, I told her that I would assure her a thousand dollars, and felt that the boys would be willing to do likewise. She agreed that my proposition with her was satisfactory, we went into the room with the others in the presence of Mrs. Hall, and I said, it had been satisfactorily arranged with Elizabeth, and that she was willing to sign such an agreement or contract when drawn. That as far as I recall ended the discussion of the bill of arrangements or contract." The widow's recollection is substantially the same. She testified that the granddaughter refused because she wanted her father's share and that "R. Lee Hall said he would go out and talk to Elizabeth and see what he could do with her, and when he came in he said she would sign for $1,000."

The secret arrangement made with the granddaughter by Dr. Hall in order to secure her signature to the agreement, and whereby she received $1,000 under the agreement, and $4,000 additional from the four sons, or $5,000 in all, was privately communicated by Dr. Hall to every one of his three brothers, and agreed to by them before the contract was executed, but it was not disclosed to Mr. Marine, and he drew the agreement in strict accordance with the feigned acceptance of the terms of the proposal of the widow, who signed the agreement in total ignorance of the real facts, and with the belief that Elizabeth Hall was to get but $1,000.

We rest the case here. It would be profitless to undertake the task of determining where truth resides among the many clashing statements in reference to alleged misrepresentations persuading the widow to sign, that were testified to by the partisan opponents who make this record, when on this one decisive act there is no conflict.

The widow and the granddaughter had not been on good terms for several years, but there is no evidence that the sons and the step-mother were dealing at arm's length. In fact, the testimony showed that with J. Keifford Hall the widow's relations were most cordial. She stated in her testimony that she trusted him as her own son, and that J. Keif-

ford Hall had said to her on the day after the death "that his father told him for him to stick to me and for me to stick to him, because we had always been the best of friends." And Hall illustrated the widow's attitude towards him by the testimony that when they were arranging for Mr. Marine to come, she said: "On Wednesday night before your father died, he called me to his side and said, 'Mammie, I realize my time is short, and when anything happens to me, you and Keifford get together, he will treat you right, for he has always been your friend.'"

The legal interests of the widow and the other representatives of the intestate in his estate had been fixed by law at his death. The meeting at the home on Monday was a family council, which was held, under the shadow cast by the death of its head, for the purpose of considering and agreeing upon a different basis for the distribution of the property than that prescribed by the statutory law of the State. In the outcome of this conference, the sons had nothing to lose, but everything to gain, as the widow was intrenched in her impregnable legal position of a one-third interest in both the realty and personalty of the intestate.

The sons and the attorney for her husband laid before her as her husband's last wish, accidentally defeated in its expression through a will by his unexpected death, that the granddaughter should have but a thousand dollars, and after a small legacy to his brother, the residue of his estate should be shared equally by her and his four sons. She was not the wife of his youth, and his fortune had not been gathered in the few years of her marriage to him; and, therefore, his conclusion was that she should have but a child's part, and his granddaughter, whose father and his son had died in an undischarged indebtedness to him, should be given but one thousand dollars. The appeal to her respect for her husband's judgment and to her loyalty to his decision made her obedient after death, and she yielded, but with the indispensable condition that the granddaughter should not receive

more than the one thousand dollars, to which her grandfather had limited her share in the estate.

The proof established that this agreement of the widow was without any adequate valuable consideration, and that what caused her to surrender to the sons the large difference between a one-third and a one-fifth portion was her generous and laudable desire to carry into effect the unexecuted will by embodying its terms in her agreement with the other parties concerned. It is clear beyond questioning that to give the granddaughter more than one thousand dollars was a defeat of her declared and controlling motive in making the agreement. Notwithstanding their knowledge of these facts, the four sons, after the positive refusal of the grandchild to accept the one thousand dollars as her share, procured the simulated consent of the granddaughter to the agreement by secretly promising to pay her four thousand dollars additional, concealed that fact from both the widow and the draftsman of the contract, and by this means secured the signature of the widow, who wrote her name last to the contract, which gravely recited that the common object of the subscribing widow, four sons and grandchild was "to carry out the intentions of the said John W. Hall as known to them relative to the disposition and distribution of his property so far as is practicable to do."

It was a situation where the widow, without any independent advice, had a right, under the conditions and circumstances, to expect from the four sons that display of good faith which is due from those occupying a dominant position by reason of the weakness and ignorance of the other party, and equity will see that their conduct is measured by the standard of such a relation.

In so holding we are simply applying "that great rule of the court, that he who bargains in matters of advantage with a person placing confidence in him is bound to show that a reasonable use has been made of that confidence." Lord Eldon in *Gibson v. Jeyes,* 6 Ves. 266, at p. 278; *Thiede v. Startzman,* 113 Md. 278, 287-289; *Reck v. Reck,* 110 Md

497, 508-510; *Cherbonnier v. Evitts,* 56 Md. 276, 294; *Whitridge v. Whitridge,* 76 Md. 54, 73-75; *Derlin v. Derlin,* 142 Md. 352; *Dorman v. Gale,* 142 Md. 408; *Bentley v. Bentley,* 141 Md. 428, 437-438.

The sons were bound to divulge the supervening purchase of the grandchild's assent, so that she could yield or withhold her consent with a knowledge of the altered situation under which the agreement was to be executed, because the changed conditions defeated the intestate's plan of distribution, and destroyed the inducement for the widow to sacrifice so much of her legal share. The existence of this secret agreement prevented the apparent consent of the grandchild from being real, and it was a material fact in the sense that, if it had been made known to the widow, it would have influenced her judgment in determining whether to agree to the contract or not, and in the further sense that the four sons and the granddaughter had no right to assume from the nature of the transaction or of the other circumstances, that the widow was taking the risk of not knowing, and had no desire to know, about their covert understanding. When the granddaughter and the four sons signed the contract, it was a representation to the widow that the granddaughter had accepted one thousand dollars as her share of the estate, and the representation was made so as to induce, and did induce, the widow to alter her position from the ownership of a one-third to that of a one-fifth interest in her husband's estate as defined by the contract.

It is no answer for the appellants to urge that this active concealment should not be stripped of its gain, because the four thousand dollars are to be paid by them and will not lessen the agreed fifth of the widow. It matters little out of what pocket the appellants draw the secret price; and the argument is specious in ignoring the proof that the widow's consent was obtained by convincing her that the granddaughter would receive one thousand dollars, as her grandfather intended, for her execution of the agreement, when, in truth, she would be paid five times that price, and that, as a conse-

quence of the collusive combination, the widow parted with her right to a full one-third of the estate and accepted the one-fifth as defined by the contract. It has been well said that "fraud in all courts, and at all stages of the transaction has been held to vitiate all to which it attaches." When made aware of the fraud, justice cannot move too quickly to bring it to an end. *Udell v. Atherton* (1861), 7 H. & N. at p. 181, 30 L. J. Ex. 337; *Wald's Pollock on Contracts* (3rd Ed.), pp. 673, 674; *Greenwood v. Greenwood* (1863), 2 DeG. J. & S. 28, 42; *Ex parte Kintrea* (1869), L. R. 5 Ch. 95, 101, C. A.; *Payne's case* and *Williams' case,* L. R., 9 Equity Cas. 223, 226; *Dorman v. Gale,* 142 Md. 408, 411; *Gale v. Mc-Cullough,* 118 Md. 287, 293, 294; *Brager v. Friedenwald,* 128 Md. 8, 33-34; *Coan v. Consol. Gas, Elec. Light & Power Co.,* 126 Md. 506, 509; *McAleer v. Horsey,* 35 Md. 439, 451-454; 2 *Pomeroy's Equity* (3rd Ed.), secs. 850, 877-879, 898-902; *Kerr on Fraud and Mistake* (4th Ed.), 63; *Cheveront v. Textor,* 53 Md. 295, 305-307; *Smith v. Stone,* 4 G. & J. 310, 321-322.

As the decree will be affirmed on the ground indicated, it is not necessary to refer to the other questions, except to say that the receipt by the appellee of a check from the administrator for $500, sent to her on account of the agreement, does not affect the position of the appellee, as this was before she discovered the collusive agreement of the sons and their niece, and as the money can be accounted for by her as a credit on her share of the estate.

*Decree affirmed, the appellants to pay the costs.*