GENERAL AUTOMOBILE OWNERS' ASSOCIA-
TION, Incorporated, *v.* STATE, for the
Use of Anna Penn.
[No. 62, October Term, 1927.]

*Decided January 11th, 1928.*

. The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Walter V. Harrison* and *Wallis Giffen,* for the appellant.

*Bruce C. Lightner* and *D. Angle Wolfinger,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

This is an appeal from a judgment recovered against the appellant, the General Automobile Owners' Association, by the appellee, Anna Penn, for the death of her husband, John Penn.

The declaration, in substance, alleged that John Penn, an employee of the defendant, was, on the 6th day of March, 1927, ordered by B. F. Mantz, manager of defendant's Hagerstown office, where Penn was at the time employed as an agent or solicitor, to accompany him, Mantz, to the defendant's office, in the City of Baltimore, upon the business of the defendant; that while on their way to Baltimore, in Mantz's automobile, driven by Mantz, the automobile skidded and ran off the state road, because of the alleged negligent driving of Mantz, causing the death of Penn.

The chief defence made was that Penn was not required or ordered by Mantz to accompany him to the office of the defendant, in the City of Baltimore, and was not at the time of his death on his way to Baltimore City upon the business of the defendant, and was, in no way, at such time, acting in the scope of his employment, and, further, that B. F. Mantz was not ordered or directed to come to the Baltimore office of the defendant, and was not acting within the scope of his employment, but was acting in pursuance of his own business at the time of the accident resulting in the death of Penn.

In the trial of the case, twelve exceptions were taken to the court's rulings upon the evidence, and one to its rulings on the prayers.

The plaintiff offered one prayer, a damage prayer, which was granted. The defendant offered seven prayers. Of these Nos. 1, 1A, 5 and 6 were rejected, while its 2nd, 3rd and 4th prayers were granted. Its Nos. 1 and 1A prayers asked for a directed verdict in favor of the defendant. The first of these asked that the jury be instructed that there was no evidence legally sufficient to entitle the plaintiff to recover, while the other asked that "under the pleadings" there was no evidence legally sufficient to enable the plaintiff to re-

cover. This prayer was, we assume, offered as a variance prayer, but as the variance between the pleading and evidence is not set out with particularity, it cannot be treated as a variance prayer.

The first prayer in our opinion was properly rejected.

The record discloses that Mantz was manager of the Hagerstown office of the defendant company, and the employees of that company in its Hagerstown office, including Penn, were under his supervision and control. As expressed by Charles R. Houpt, secretary and treasurer of the defendant association, in the City of Baltimore, "he (Mantz) hired and fired" such employees.

Anna L. Penn, widow of John Penn, and a witness offered by the plaintiff, testified without objection that, the night before the accident, her husband told her that he, Mantz, together with James Lesher and Richard M. Spielman, two other employees of the Hagerstown office, were on the next day going to the Baltimore City office of the association, where they had been called upon the business of the defendant's association, and on the next morning, Sunday, March 6th, he left his home at six o'clock to go with Mantz and others to the City of Baltimore.

James Lesher testified that he, with Spielman, Penn and Mantz, left Hagerstown between 7.30 and 8 o'clock A. M. on that morning for Baltimore, in Mantz's car, with Mantz driving it. When they reached Frederick, they got out, went into a restaurant and got a cup of coffee. Mantz had a bottle of whiskey; this he emptied unto the coffee, which he and Penn drank. Thereafter Mantz showed the effects of intoxication. He further testified that the roads that morning were slippery. "It would rain and clear up a little and rain again, raining practically all the morning. We left Frederick and started on our way to Baltimore, and about a mile and a half on the other side of New Market, he (Mantz) lost control of the machine and it went down an embankment." The witness testified that there was a curve in the road at the point of the accident, and the machine skidded in attempting to make the turn. In going down the embank-

ment, the car, turned over three times; that "at the time of the accident Mr. Mantz was driving about forty miles an hour. As the car left the road, Mr. Penn said, 'We are gone,' and started to get out, and I began to prepare myself; I did not see him get out. When I next saw Mr. Penn, after I had gotten out of the car, he was on the ground, between the left running board and the ground. * * * We put Mr. Penn in a car and Mr. Spielman went with him to the hospital," where he died on March 18th, 1927. On cross-examination, Lesher testified that the trip to Baltimore was first suggested to him on Saturday night, about 7.30 P. M. "Me and Mr. Penn and Mr. Frank Mantz were together at the time, in the Hagerstown office. Q. What was the occasion of your visit to Baltimore? A. To go down on some business with some salesman causing trouble at this office. Q. What did this trouble relate to? A. Related to Mr. Mantz's job. Q. Was that the only purpose of your going to Baltimore? A. Yes, I suppose. Q. Did you regard Mr. Mantz's position as being in jeopardy by reason of something that some one else did? A. Yes. Q. But you were on no business of your own? A. No, sir; just ordered by him to go down. Q. Did he force you to go? A. He told us we had to go to Baltimore. Q. Did you regard it obligatory to go to Baltimore, as a result of this alleged order from Mr. Mantz? A. Yes, sir. Q. But you were going on no business of your own? A. No, sir. Q. That applied equally as well to the other occupants of this car? A. Mr. Penn had to go, it seemed; it was ordered. Q. What did Mr. Mantz say to Mr. Penn in your presence? A. He told him he wanted him to go to Baltimore the following morning, that Purnelli had caused some disturbance. Penn said, 'No, I won't go'; he said, 'Penn, you got to go down and help me out'; so finally Penn decided to go down." The witness further testified: "We were supposed to get at the office (Hagerstown office) at seven o'clock A. M. I got there a little late and when I went there they were over, Mr. Mantz, Penn and Spielman; when I come in, they said something about postponing going to Baltimore, and then again we started out; something that

they would stop at a club and have some good beer on the way down and could catch Mr. Houpt in his office. * * * Q. Had Mr. Mantz refused to go because of bad weather in the restaurant? A. He didn't refuse to go; he said he didn't think we would go, and I regarded this as final. I went to go out of the restaurant to go to the office and we got in the car and Mr. Mantz said, 'Come on, we are going to Baltimore,' so I put on my overcoat and got in with him, Penn, Spielman and myself were together." When asked did he think that he (Mantz) was capable of driving this automobile, he said, "To tell the truth, I did not like the way he drived it. * * * I didn't say he was drunk. At the time of the accident he was driving about forty miles an hour, and I regarded that unduly fast, considering the condition of the road, but no objection was raised as to the speed. Mr. Penn was sitting in front and I was on the rear seat with Mr. Spielman."

Mr. Mantz, when called to the stand by the defendant, testified that on Saturday, when expecting to go to Baltimore on the next day, Sunday, he wired Mr. Foster of the Baltimore office, telling him that he would be at the Baltimore office on the next day. "Q. Did you tell him to be there? A. He is always there. I told him I would see him at Mr. Houpt's office. Q. Why did you want to see him at Mr. Houpt's office? A. That was Saturday; Sunday it was an entirely different story. For the same reason that I talked to these other men on Saturday due to this Purnelli affair." The court then asked, "There was somebody making trouble for the company, injuring the business? A. Yes, sir. Q. And you were trying to straighten that out? A. Yes, sir. Q. That was the thought you had first? A. On Saturday, yes, sir."

The test to be applied, in determining the legal sufficiency of the evidence, is whether it is of sufficient probative force to enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the plaintiff's right. *Parker v. Power*, 127 Md. 598; *Moyer v. Justis*, 112 Md. 220, and other cases.

Applying this test, the evidence stated, tending to show facts necessary and essential to the plaintiff's right to recover, was, in our opinion, legally sufficient to go to the jury to be considered in connection with the other evidence in the case, in determining the rights of the plaintiff. But we are not to be understood as deciding that the evidence when so considered was sufficient to entitle the plaintiff to recover, as the determination of that question is exclusively within the province of the jury. The jury is to determine how far the individual witnesses are to be believed and the weight to be given to their testimony, and after hearing the whole evidence, to decide thereon whether the plaintiff should recover.

By the defendant's fifth prayer, the court was asked to instruct the jury, if they found that Mantz and Penn were fellow-servants, the plaintiff was not entitled to recover. This prayer, we think, was properly rejected, as there was no evidence in the case upon which that relation between the parties could be found to exist. *State v. Malster*, 57 Md. 308. Nor do we find any error in the court's ruling in rejecting the defendant's sixth prayer; and the same may be said of the court's action in granting the plaintiff's first and only prayer, the objection to which does not seem to have been urged by the defendant.

We now come to the rulings upon the evidence. In considering and passing upon these exceptions, we must bear in mind the defences made to this suit, one of these being that Penn was not, at the time of the accident, on his way to the City of Baltimore upon the business of the defendant in obedience to its orders, and at such time he was not acting within the scope of his employment, but that he, at the time of the accident, was going to Baltimore on a pleasure trip with Mantz, Lesher, and Spielman, its purpose and object having no connection whatever with the business of the defendant.

There are in all, thirteen exceptions to the testimony.

In the first of these exceptions, the witness Lesher was asked by the plaintiff if he was ordered to go to Baltimore on the day of the accident in the automobile of Mr. Mantz.

Over the objection of the defendant, the witness was allowed to answer, and his reply was "Yes, sir." It had been previously testified that Mantz, Penn, Lesher, and Spielman had all been called to Baltimore on the business of the defendant company. If in asking this question the inquiry was whether he, with the others accompanying him, including Penn, had been called to Baltimore on such business, and he so understood the question, there was, we think, no harmful error committed in allowing him to answer it, especially in view of other evidence subsequently admitted without objection.

In the second exception Lesher was asked: "Did Mantz show you the card certifying membership in the Democratic Club in Baltimore" (the club referred to in the evidence)? The witness was not allowed to answer this question. We discover no error in this ruling of the court, as the evidence sought to be elicited thereby would have no relevancy to any of the issues involved, but if so, this evidence was subsequently admitted without objection.

The third, sixth and eighth exceptions were to the refusal of the court to allow the witness Lesher on cross-examination to answer the following questions: 3. Isn't it true that in your all going to Baltimore, you were there primarily to benefit Mr. Mantz, and on business of Mr. Mantz, his personal business? 6. Were you on your own pleasure, unconnected with any business of the company? 8. Do you know whether or not Mr. Penn intended to transact any business with the company in going to Baltimore? The witness was upon cross-examination, and in view of the defences made, the information sought by these questions was essentially important to the defence. Upon the answers thereto largely depended the liability of the defendant, for if the trip to Baltimore was made "to benefit Mr. Mantz and on business of Mr. Mantz, his personal business," or if it was made "for their own pleasure, unconnected with any business of the company," the defendant would not be liable to the plaintiff for the loss suffered in the death of Penn. Therefore, we cannot escape the conclusion that the court committed reversible errors in not permitting the witness to answer these questions.

The question asked in the fourth exception was substituted for the one asked in the sixth exception, and we need not pass upon it.

In the seventh exception, where the question asked seemed to confine the inquiry to the action of the witness, we find no reversible error.

The ninth exception is to a question asked Dr. Norment. The objection was made by the defendant that the witness was not shown to have been qualified to testify as to the general condition of Penn's health prior to the happening of the accident. The witness had stated that for three and one half years he had practiced medicine in Hagerstown, and was Penn's family physician. The question of his qualification as a witness rested largely in the discretion of the trial court, and its ruling thereon is not reversible, unless founded on some error of law or on serious mistake or abuse of discretion (*Balto., C. & A. Rwy. Co. v. Moon,* 118 Md. 392), and no error of law, serious mistake, or abuse of discretion is found in this ruling of the court.

The remaining exceptions were to the refusal of the court to allow the following questions to be answered: "(10) On that particular day were you (Houpt) in the office of the association in Baltimore? (11) (Speaking to Mr. Houpt): Has Mr. Mantz come to Baltimore prior to this occasion on any business of the association, at your invitation? (12) Did the company contribute anything to the maintenance of that automobile (meaning Mantz's automobile)? (12A) Isn't it true that Mr. Penn said to this little girl (the waitress in the restaurant at Frederick), 'We are going to get some of the finest beer you ever had in Baltimore?' (13) Is it not true that Mr. Penn invited Miss ———" At this point, the counsel was interrupted in his question by the court, saying, "If questions of this kind are repeated, you are going to be held in contempt of court and will be punished," to which remarks of the court an exception was taken.

We have considered each and all of these exceptions, and find no reversible error in any of them, and we deem it un-

necessary to further prolong this opinion by a discussion of them.

Because of the reversible errors pointed out in the rulings of the court upon the evidence, the judgment of the court below will be reversed.

*Judgment reversed, and a new trial awarded, with costs to the appellant.*