## AETNA CASUALTY & SURETY COMPANY *v.*
### STATE, use of Pauline Hendrichs.

[No. 46, October Term, 1931.]

*Decided January 20th, 1932.*

50

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Parke, and Sloan, JJ.

*William D. Macmillan,* with whom were *William H. Price, Jr.,* and *Semmes, Bowen & Semmes,* on the brief, for the appellant.

*B. Harris Henderson,* with whom was *Maurice T. Siegel* on the brief, for the appellee.

Sloan, J., delivered the opinion of the Court.

This is a suit brought by the State, for the use of Pauline Hendrichs, against the Aetna Casualty & Surety Company, surety on the bond of the administrators of the estate of her husband, John E. Hendrichs, deceased, to recover her distributive share of his estate. The declaration charges that Henry E. Hendrichs and Harry C. Kalben filed in the Orphans' Court of Baltimore City their first and final account as administrators of the estate of John E. Hendrichs, deceased, wherein they charged themselves with the distribution to Pauline Hendrichs of her "spouse statutory allowance, $75.00," and a distribution "to Pauline Hendrichs, widow, one-third cash, the sum of $6,041.30," and that the distributions or any part thereof have not been paid.

The defendant, appellant, pleaded the general issue, pleas of never promised, never indebted, payment, release, and limitations. The plaintiff joined issue on the first and second pleas, and traversed the third and fourth, saying to the fourth plea "that the alleged deed of release was procured by the deceit, misrepresentation and fraud of Henry E. Hendrichs and Harry C. Kalben, Administrators," etc. There was a demurrer to the plea of limitations, which was sustained. On the trial, the judgment being in favor of the

plaintiff for the amount claimed, with interest, the defendant appealed.

John E. Hendrichs died intestate August 16th, 1926, leaving surviving his widow, Pauline Hendrichs, the equitable plaintiff, and a son, Henry E. Hendrichs. Letters of administration were granted to the son, Henry E. Hendrichs, and Harry C. Kalben, a member of the Baltimore bar, on August 20th, 1926. By renunciation dated August 19th, 1926, Mrs. Hendrichs renounced her right to administer her husband's estate and requested the appointment of her son and Mr. Kalben. They qualified and filed their bond with the appellant as surety. An inventory filed September 20th, 1926, showed assets appraised at $20,376.72. The amount accounted for was $20,454.97. The distributions, according to the first administration account filed March 19th, 1926, after deducting orphans' court costs, spouse's statutory allowance, $75, income taxes, $496.41, administrators' commissions, $1,409.83, and state tax, $201.09, in all $2,422.11, left to Pauline Hendrichs, widow, one-third, or $6,041.30, and to Henry E. Hendrichs $12,082.56. Included in the distribution to Henry E. Hendrichs were all the shares of stock at the appraisal of $1,986, and a Dodge sedan appraised at $400. The consent of the mother to the distribution in kind to her son, signed by Mrs. Hendrichs, was filed with the account. In the record are two releases, signed, sealed, and acknowledged by the distributees, both dated November 24th, 1926, Henry E. Hendrichs' acknowledgment bearing the same date. Mrs. Hendrichs' acknowledgment is dated November 26th, 1926. The signatures were witnessed by Meyer Steinberg, the notary by whom the acknowledgments appear to have been taken. The checks for both distributees are dated November 24th, 1926. The checks, signed by Henry E. Hendrichs and Harry E. Kalben, to Mrs. Hendrichs, are indorsed "Pauline Hendrichs" in her handwriting, and below her indorsement on each check is stamped "for deposit only to the credit of Henry E. Hendrichs." The check for the spouse's allowance, $75, was cashed or deposited at the American Trust Company on December 10th,

1926, and paid by the Liberty Street branch of the Merchants' National Bank December 12th, 1926. The check for Mrs. Hendrichs' distributive share of the estate, $6,041.30, was deposited in the Merchants' National Bank to the credit of Henry E. Hendrichs' personal account December 10th, 1926. One of the checks to Henry E. Hendrichs was deposited November 27th, 1926, and the other on November 29th, 1926.

While the replication to the fourth plea charges Henry E. Hendrichs and Harry C. Kalben with procuring the release from Pauline Hendrichs by deceit, misrepresentation, and fraud, none of the testimony reflects on Mr. Kalben in any particular.

Asked what discussion she had with her son about the administration, Mrs. Pauline Hendrichs said: "Well, he came to me at that time and said, Mother, who should be administrator for you, and I said, Son, you have done all in your power all your life to be a good boy and I think I will let you take it, and he taken it. Q. Now what was said about Mr. Kalben at that time? A. He did not say anything at that time, but in a couple of days afterward he said, Mother, I have a very good lawyer for you and you don't have to worry because the lawyer and the bonding company will be right with you." She said that up to that time she did not know Mr. Kalben, had never seen him. Then asked, "What papers were submitted to you to sign?" she said, "Well he used to bring home—the first paper he brought home he said, Mother, you will have to sign this because it is for the Orphans' Court, it is a whole lot of red tape about it, but it does not concern you much but sign it here, and I signed it, but what it was I don't know." She was then shown what was the first paper in the administration, the renunciation in favor of her son and Harry C. Kalben, and, asked to identify her signature, said, "It looks very much like it, yes, sir." Then asked what occurred between her and her son relative to the estate, she said: "Nothing. I never knew anything; never knew anything at all about it; he never took me to the lawyer's office or anything." She

said she had never been in the office of Mr. Kalben at any time. "No, sir; I never put my foot in there." Next, shown the paper consenting to the distribution in kind to her son of the stocks and automobile, she said: "He just told me to sign it, he never told me anything." Said nothing about the distribution, would not take her to the lawyer's office; "I could not worry him because he is too busy." Asked if she did "not say to him that it would be all right if he wanted the stock and automobile for him to have it that way"? she said, "I told him to put it all together and leave it all go at one time." Said she had no objection to him having the stock, and then denied that she knew there was some stock. It does not appear that there was any advantage gained by Henry E. Hendrichs in taking over the stock and the automobile at the appraisal. Presented the release for the spouse's allowance of $75 and the distribution of $6,041.30, and asked if the signature to it was her's, she said, "It looks like it, yes, sir." When told that it recited that she had acknowledged receipt of the sums of money named, she said, "I never got a cent at all."

"Q. Do you recall what was said to you, if anything, at the time this release was signed? A. No, sir. Q. Do you recall what was said to you by your son? A. I did not even know it was signed. He never told me anything."

Mrs. Hendrichs testified that on one occasion (and the contention of appellee is that it related to the execution of the release) the son phoned to her that some man was going to call her up and that she should answer the questions that he wanted her to answer, and she said, "What are the questions? You tell me first, and then I will answer them, and just when I was ready to answer him some other gentleman came to the phone and he asked me several questions and of course I answered him according to what he asked me. Q. What did he ask you? A. I could not recollect that any more." Her attorney then undertook to supply the omission with the question: "But that is the only time any one ever asked you if you signed any papers. Is that what I understand you to mean?" to which she answered, "Yes."

Mrs. Hendrichs was then questioned concerning the two checks drawn by the administrators to her order, dated November 24th, 1926. She repeated that she had never been in Mr. Kalben's office, and that he had never given her a check. She said the indorsement looked "very much like" her signature. The signatures to the three papers and the indorsement on the checks were admitted by her counsel to be genuine. At the court's suggestion she was asked: "Q. Have you any explanation to make of the signature on this check? A. No. Q. Have you any explanation to make why you signed it? A. No, sir. If I did sign it it was signed the same way as I signed the other papers. Q. How was that? A. Walk over and say quick, hurry up and sign it. He would never let me look on the other side but just hurry up and sign it here, mother. That is all. Q. You never gave him any of this money to use in the business? A. No, sir; because I never knew he was getting the money. Q. Does that apply to everything? A. Yes, sir; because he always used to tell me, Mother, there will be no money until the court is settled, until father's estate is settled. He said that for almost three years."

It was two years after the estate had been settled that Mrs. Hendrichs and her daughter-in-law, Bertha M. Hendrichs, went with Mr. Schoeneis, a member of the Baltimore bar, to the Orphans' Court, where they were shown the accounts, and the consent and release were exhibited, and the daughter-in-law testified that her mother-in-law there said she did not remember signing them, and said nothing as to how her signatures were procured. They then arranged a conference that afternoon at Mr. Schoeneis' office, when Mr. Kalben had the checks. The mother said she "did not sign any checks," but said they looked like her signature. The younger Mrs. Hendrichs testified that to the mother's inquiries the son had said it took two years to settle an estate, and both testified that he just kept putting her off. His testimony was that at her lawyer's office he was accused of forgery and swindling his mother out of her estate, whereupon he left the house in which he had resided with his

mother, wife, and son, and that he is now living apart from his family at Camden, N. J.

On cross-examination of the elder Mrs. Hendrichs the following occurred: "Q. Now, Mrs. Hendrichs, I understand you to say that when you signed these various papers your son simply did not tell you anything about them? A. No, sir. Q. He just said, mother, sign this paper? A. That is the idea.

"Q. It is necessary for you to sign them— A. Necessary for you to sign them, all red tape for the orphans' court and does not interest you a bit. Q. Of course, Mrs. Hendrichs, when you endorsed these checks, you of course knew they were checks, did you not? A. Yes, sir; I knew they were checks. Q. You knew then you were endorsing the checks when you endorsed the checks? A. Yes, but I did not know for what or anything else. Q. So all you did was to endorse a check because your son asked you to endorse it. A. He asked me to endorse it."

She said she was at home when the checks were indorsed. With regard to the release, she said, "I never read it." He would not let her read it. "Many and many a time I asked him to read them and he just said he did not have time." He would have the (news) paper in his hand and cover that up and ask me to sign." "Sometimes he had others folded." "Q. Every time you signed something— A. It was folded; he would tell me not to worry. I have a good lawyer and he would see I would get all that was coming to me." Then asked if "it did not occur to you that it was rather suspicious that your son should come to you with a newspaper and put it over a paper and ask you to sign it?" she answered: "Yes, it did look suspicious." "Why did you sign them? A. In the condition I was in I suppose I signed it thinking he was nice enough to take care of me. Q. In other words, Mrs. Hendrichs, at the time you signed these papers you had implicit confidence in your son? A. I certainly did."

We have related substantially all the evidence upon which the plaintiff relies for a recovery, and the test to be applied in determining its legal sufficiency "is whether it is of suffi-

cient probative force to enable an ordinarily intelligent mind to draw a rational conclusion therefrom in support of the plaintiff's right." (*General Automobile Owner's Association v. State, use of Penn,* 154 Md. 204, 209, 140 A. 48, 51); and "in deciding this question, the court was first to assume the truth of all the testimony given to the jury, tending to sustain the plaintiff's right to recover, and of all inferences of fact fairly deducible therefrom." (*Francis v. Outlaw,* 127 Md. 315, 319, 96 A. 517, 519).

The evidence is contradictory, but, as it is not the province of this court to consider the weight of the evidence, our consideration of the record is solely with a view to ascertain whether there is legally sufficient evidence that the plaintiff was not paid her distributive share and widow's allowance in her husband's estate; or, assuming that there is no evidence of payment, the release was procured by fraud, deceit, or misrepresentation. *Standard Motor Co. v. Peltzer,* 147 Md. 509, 513, 128 A. 451. If the plaintiff produced legally sufficient evidence that she was not paid, and that the release executed by her was procured by fraud, then the case should be submitted to a jury. In this case there is a plea of payment, and the plaintiff's right to recover must stand or fall on this issue. Even if the release were held to have been procured by deceit, misrepresentation, or fraud, it would still be necessary for her to show she had not been paid. With the check given her having been negotiated with her indorsement, there is a presumption that it was given in payment of her distribution, and the burden is on her to otherwise explain the transaction. *Nealon v. Travers,* 160 Md. 324, 153 A. 44. Merely saying that she was hurried into execution of the release—that it was acknowledged over the telephone or that she never saw the other administrator—will not explain away the fact that she did receive checks for her share of her husband's estate and that they were later negotiated with her indorsement. She relies on her memory for the charges of misconduct of her son in the administration of the father's estate, so far as they relate to her, and relies on it in her attack upon the validity of the release, but,

when it comes to the check, the same memory fails her and she then says, "If I did sign it, it was signed the same as I signed the other papers," yet she admits on cross-examination that she indorsed the checks, knew they were checks, but says, "I never knew I was getting $6,000."

Appellee's counsel, evidently realizing that he was without independent evidence as to the checks, fell back upon a quotation from Judge Parke's opinion in *Hall v. Hall,* 147 Md. 193, 127 A. 858, 862, that "It has been well said that 'fraud in all courts, and at all stages of the transaction has been held to vitiate all to which it attaches.'" Statements of principles are usually made with reference to the facts of the case in hand, and as a guide to be followed in like situations, and the quotation just made fitted perfectly into the facts of that case. It was a case wherein the widow and children and a grandchild of a decedent had made an agreement for distribution of an estate differing from that provided by law in case of intestacy, and without her knowledge the children made another agreement with the grandchild which the widow refused to entertain. When the widow became aware of the secret agreement, and before distribution, she filed a bill in equity to rescind her agreement, and was sustained by the chancellor and by this court.

In the instant case the appellee charges fraud in every transaction between Henry E. Hendrichs and his mother from the death of the father in August, 1926, down to the bankruptcy of his business in September, 1928, when all the money both had received had gone with it, and from these facts it is assumed that the payment of the money was so tainted with the fraud alleged as to other transactions that it must have been fraudulent also. The caution to be observed in measuring the legal sufficiency of evidence of fraud, as stated in *Hammond v. New York, P. & N. R. Co.,* 128 Md. 442, 97 A. 1011, 1012 (a suit at law), is that: "Evidence of fraud, to warrant a court in submitting a case to the jury as to the invalidity of an instrument under seal, must be clear, direct, and satisfactory. In *Pa. R. R. v. Shay,* 82 Pa. 198, a somewhat similar case, Mr. Justice Sharswood

said: 'It has been more than once held that it is error to submit a question of fraud to the jury upon slight parol evidence to overturn a written instrument. The evidence of fraud must be clear, precise, and indubitable; otherwise it should be withdrawn from the jury,' " and in *Shafer v. Shafer*, 85 Md. 554, 561, 37 A. 167, 169, cited in the *Hammond* case, it was said that "Fraud is not a presumption, but is a fact to be shown by legal and competent evidence, as any other fact is proven."

Although the evidence of the appellee as to the payment to her by the administrators is one of forgetfulness, there was some testimony concerning it which did not lack positiveness. Mr. Kalben's testimony was that he had the account stated, prepared the checks, all dated November 24th, 1926, in payment of all the items in the account, including the distributions to Mrs. Hendrichs and her son, and prepared the releases to be executed by them. He sent the releases, both dated November 24th, 1926, on the morning of that day, to Henry E. Hendrichs, who came back with them in the afternoon, signed, respectively, by him and his mother, but neither of them was acknowledged. Henry E. Hendrichs, at Mr. Kalben's suggestion, acknowledged his release then and there, and took it away with him, and two days later brought his mother to his office, and she acknowledged her release on the 26th, before Meyer Steinberg, a notary, which is the date appearing on the acknowledgment, and then Henry E. Hendrichs was given two checks, one for his distribution and one-half the commissions, and Mrs. Hendrichs two checks, one for her distribution and one for the widow's allowance. Mr. Kalben's testimony is corroborated in every essential particular by Henry E. Hendrichs, whose depositions had been taken at Camden, N. J., November 25th, 1930, more than two months before this case went to trial in Baltimore. The testimony about the acknowledgment of Mrs. Hendrichs was corroborated by Mr. Steinberg, an attorney, who was the notary. He said it had already been signed when he was called in.

No opinion can be expressed on the weight of the evidence as to when, where, or how the acknowledgment of Mrs. Hendrichs was taken. The witnesses all agree that it was not signed in Mr. Kalben's office So far as the demurrer prayers can be considered, they admit as true the testimony of Mrs. Hendrichs that she never was in Kalben's office, and that she never met him until nearly two years after the settlement of the account in the orphans' court, and the prayers must be taken as admitting the release was executed as she testified.

The only affirmative evidence as to what was done with the checks payable to the order of Pauline Hendrichs and her son comes from Kalben and Hendrichs, who say that Kalben gave to each of them their respective checks. Henry E. Hendrichs took his checks for $9,696.56 and $704.92, and deposited one of them on November 27th, and one on the 29th, but the record does not disclose the checks deposited on the respective dates.

Mrs. Hendrichs' checks were both deposited by Henry E. Hendrichs, to whom they appear to have been indorsed in blank by Mrs. Hendrichs. The only inference to be drawn from the evidence is that they were given to her for the purposes and in the amounts set out in the release. "Bank checks of the debtor, payable to the order of the creditor and indorsed by him are admissible in evidence to show payment of the debt for which they were given." 48 C. J. 636. The checks to the order of Pauline Hendrichs were in some one's possession from November 26th to December 10th. The checks which Henry E. Hendrichs had received payable to his order were both deposited within three days of their delivery to him; the mother's checks did not find their way to the bank for two weeks. The statement is made in the record that one of Mrs. Hendrichs' checks was deposited on December 10th and the other on the 12th. Photostatic copies of the checks are also in the record, and the bank indorsements show that the check for $75 was deposited or cashed at the American Trust Company on December 10th, 1926; passed through the Baltimore Clearing House, and was paid by the

Merchants' National Bank, on which it was drawn, December 12th, 1926; the other was deposited in the Merchants' National Bank December 10th, 1926. In the meantime somebody had possession of them.

The son testified: "She got her two checks, endorsed them and gave them to me to put in the business because she knew I needed them. Q. Was that sudden? Did she suddenly make up her mind to do that? A. No, not suddenly. She insisted on doing that right from the start. All went into the business eventually. As long as (I) kept her a home and kept her she was satisfied that I should have it. Q. Why wasn't it at the time the account was stated—why wasn't it all turned over to you? A. I refused to take it time and time again. I says: 'I'll get along without it, until finally she made me take both checks.'" He testified that he deposited the checks the day his mother gave them to him. They were no use to him without her indorsement, and with her genuine signature on the back of them, in the absence of any evidence to the contrary, the presumption is that they were in her possession and under her control.

In the indorsement of the checks the plaintiff can hardly be heard to say that she never knew she "was getting $6,000," when it was written on what she knew as a check. There is no pretense or suggestion that she could not have read what was printed on it plainly by a protectograph or other check protecting machine. If she did not know that she was indorsing and turning over to her son two checks, one of which was for more than $6,000, it was the grossest kind of carelessness on her part. There is no evidence that it was not in her power to inform herself of the contents of a bank check which she must have known, if she can be credited with knowing anything. If her testimony regarding the indorsement of the check proves anything, it is "not fraud on the part of the" son, "but carelessness on the part of the plaintiff." *Spitze v. Balto. & O. R. Co.,* 75 Md. 162, 171, 23 A. 307, 310.

The complaint of Mrs. Hendrichs is that she never got any money out of her husband's estate. One thing is certain, and

that is that Mr. Kalben was not paying out any money until he had the releases in his hands, and, when he received them, he disbursed the funds by the checks which have been mentioned. When he did this, he thought he had been released and the surety discharged, and he did not know otherwise for two years. If the appellee's contention now is good, an administrator will not be safe until he personally accompanies a distributee to the bank and sees his check actually cashed or deposited to the credit of the payee. In this instance, the evidence is uncontradicted that Mrs. Hendrichs had the checks in her hands. Whatever was done with them afterwards she did. Her son's explanation is that she gave them to him. Another would be that she loaned him the money, or that she indorsed the checks and gave them to him to deposit for her, and he deposited them in his account instead of hers. If it was any one of the three alternatives, her recourse would be against her son personally, but that would not restore the money, as he is bankrupt, and in bankrupting himself has bankrupted his mother also.

In the trial of the case the effort seems to be to cast suspicion on every act of every person concerned, and to show a course of conduct in which at every stage there was deception, concealment, and fraud. In the settlement of this estate, there were three papers signed by Mrs. Hendrichs. The first was the renunciation. At the outset she said she wanted her son to be administrator. He in turn asked his attorney to act as coadministrator. This was not the act of one who intended to plunder and appropriate the estate. Before they could obtain letters, the widow had to renounce in their favor, and she accordingly signed a renunciation. There is no evidence of fraud or misconduct at this stage of the proceedings. The administrators qualified, gave notice to creditors, had an appraisement made, collected the proceeds of life insurance policies, and in three months proceeded with the distribution of the estate. The stock and automobile had not been disposed of. Henry E. Hendrichs was willing to charge his distribution with them at the appraised value, but before doing this it was necessary to get

the consent of his mother, who was the only other distributee. She testified that she was willing to have him take the stock. That willingness was also expressed by her written consent filed with the account. Where is there a suspicion of fraud up to this point? The personal estate was accounted for and made ready for distribution, and was in hand. There was some stress laid at the trial on the haste of the administrators in settling before the six-months period had expired, within which creditors could have filed claims, and some point made of it, but that was at the risk of the administrators and their surety, and one such claim was afterwards paid by Henry Hendrichs. See *Jones v. Harbaugh,* 93 Md. 269, 278, 48 A. 827.

This brings us to the release. We have a release which on its face is regular. It acknowledges the receipt of the sums of money named in the administrators' checks and in the account, and was signed and appears to have been acknowledged. Whatever presumptions there may be are in favor of its validity. It is an instrument under seal, operates as a discharge of principals and surety, and is an obstacle in the way of a recovery of what it purports to release, unless subject to attack for deceit, misrepresentation, or fraud in the execution or in the consideration. *Nelson v. Chesapeake Construction Co.,* 159 Md. 20, 149 A. 442. Since the decision in the case just mentioned, the jurisdiction of a court of law extends to the consideration (in this case the distribution), even though the appellee knew and understood the character and import of the instrument she executed. The payment, uncontradicted evidence of which we find in this case, of the amount the appellee was entitled to receive, reflects the validity of the release, rather than the reverse, as she contends. The testimony of the appellee is not clear, direct, and satisfactory (*Hammond v. New York, P. & N. R. Co.,* 128 Md. 448, 97 A. 1011), as to any of the fraudulent acts charged, and all relates to her general complaint that she did not receive any money out of the estate. Instead of the failure of payment being assumed because of the fraudulent acts of the administrators preceding it, in the opinion of this court,

the uncontradicted evidence showing payment, the charges of fraud preceding payment are without foundation, and the appellant's prayer for a directed verdict should have been granted.

This view of the evidence, therefore, renders unnecessary the discussion of any other exceptions.

<em>Judgment reversed, without a new trial, with costs.</em>