# IMPALA PLATINUM LIMITED *v.* IMPALA SALES (U.S.A.), INC. ET AL.

[No. 125, September Term, 1977.]

*Decided July 19, 1978.*

The cause was argued before SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Francis D. Murnaghan, Jr.,* with whom were *Benjamin Rosenberg* and *Shearman & Sterling* on the brief, for appellant.

*George W. McManus, Jr.,* with whom were *S. Michael Floam* and *Daniel H. Bathon* on the brief, for appellees.

ORTH, J., delivered the opinion of the Court.

*STATEMENT OF THE CASE*

This case began on 7 February 1975 with an action of *assumpsit* filed in the Circuit Court for Cecil County by

Impala Platinum Limited (Impala) against Impala Sales (U.S.A.), Inc. (Sales) to recover $730,141.18 for goods sold and delivered, namely platinum and platinum group metals,[1] during the period 7 June 1974 to 26 January 1975, and the issuance of attachment on original process against Colonial Metals, Inc. (CMI). On 1 April 1977, after an eleven day trial before a jury, the case ended, as to the claim of Impala against Sales with the entry of a judgment n.o.v. in favor of Impala against Sales in the amount of $730,141.18 with interest, and, as to a counterclaim by CMI, with the entry of a judgment absolute in favor of CMI against Impala in the amount of $2,102,312. On 2 May 1977, it concluded as to the garnishee action with the entry of a judgment absolute against CMI, garnishee, in the amount of the judgment in favor of Impala against Sales with interest from 7 February 1975.

On 26 April 1977 the court issued an order pursuant to Maryland Rule 605, whereupon the parties noted appeals to the Court of Special Appeals. On 28 April Impala appealed "from that portion of the judgment . . . awarding the sum of $2,102,312.00 to [CMI] on its Counterclaim against Impala . . . , pursuant to the jury's verdicts on Counts I and V of the Counterclaim of [CMI] against Impala. . . ." On 29 April CMI appealed "from that portion of the Judgment . . . in favor of . . . Impala . . . against . . . [CMI] on Counts II, III, IV and VI of the Amended Counterclaim, which judgment was entered pursuant to the direction of the Lower Court." [2] The same day Sales appealed "from that portion of the Judgment . . . awarding the sum of $730,141.68 with interest thereon . . . which Judgment was entered by reason of granting [Impala's] Motion for Judgment N.O.V. contrary to the Jury's verdict." On 2 May CMI, garnishee, noted an

---

1. Hereinafter "platinum" shall include the platinum group metals such as palladium, rhodium and ruthenium.

2. The propriety of the direction of a verdict by the trial court with respect to Counts II, III, IV and VI of the Amended Counterclaim was not argued in the brief, entitled "Brief of Cross-Appellants," submitted by CMI and Sales. The matter is deemed to have been waived. Maryland Rules 831 c 2 and 846 f; Ricker v. Abrams, 263 Md. 509, 516-517, 283 A. 2d 583 (1971). *Cf.* Meyer v. Gyro Transp. Systems, 263 Md. 518, 532-533, 283 A. 2d 608 (1971). The appeal by Sales from the judgment n.o.v. was argued in its brief in which it deemed itself a "cross-appellant." *See* Dreisonstok v. Dworman Bldg. Corp., 264 Md. 50, 53, 284 A. 2d 400 (1971).

appeal from the judgment of condemnation absolute entered that day in the attachment portion of the case. We certified the case for review before decision by the intermediate appellate court.[3]

## THE FACTS

The underlying basis of the litigation is not disputed. Impala was formed in South Africa in 1967 to mine, refine and market platinum from a concession located in the territory of Bophutswana. Prices for dealer transactions in platinum fluctuated widely. Impala sought contracts of extended duration with fabricators and consumers other than dealers to establish set producer prices in order to provide greater stability and to enable more reasonable planning for future production quantity levels. It acquired the entire interest in Ayrton Metals, Ltd. (Ayrton), an established broker or dealer in metals with headquarters in London, which, prior to the acquisition, had been unaffiliated with any producer of metals and purchased and sold on the world market individual lots of metals wherever produced, and whether virgin or recovered metal. Through Ayrton, Impala negotiated some supply contracts with consumers in the United States, although, according to Impala, Ayrton continued to operate primarily as a dealer, buying and selling metal from many sources without direction from Impala. In 1971 Sales was formed as 100% subsidiary of Impala to give Impala "a presence in the United States." From its headquarters in New York City, Sales sought out ultimate consumers of platinum in the United States with whom to enter into contracts for the supply of Impala-produced platinum. Impala sold to Sales at a price 5% below the producer price and Sales negotiated long-term contracts with consumers at the producer price. On 1 September 1972 Impala and Sales executed two contracts to assure to Sales the supply of the Impala-produced metals,

---

**3.** Impala, CMI and Sales cross-appealed from the same judgments from which they appealed. They did so "for protective purposes only in the event the order under Rule 605 was determined to be invalid or improper." Inasmuch as the validity and propriety of the order under Rule 605 is not in question, the cross-appeals are moot.

platinum and palladium (the Supply Contracts). The Supply Contracts set yearly limits on the amounts of the metals Impala was bound to supply and Sales was bound to order. There was an amendment in the middle of September with respect to the limits on the amount of metals. The two Supply Contracts contained substantially the same terms, covering, for example, the type of material, its purity, quantity and price, price protection, delivery, documents to be furnished, title and a prohibition against assignment of rights and obligations thereunder by one party without prior written consent of the other. Clause 10 required that payment in U.S.A. dollars be not later than 30 days after delivery. There were two provisions for termination. Clause 11, entitled "DURATION," provided:

> "This agreement shall commence from August 1st, 1972 and shall be deemed to have been renewed automatically each year on the same terms and conditions, unless notice of termination is given by the one party to the other (Six) 6 calendar months prior to the expiry date."

Clause 16, entitled "BREACH OF CONTRACT," read:

> "(a) Should either the SELLER or the BUYER commit a breach of any of the terms and conditions of this Agreement and fail to remedy such breach within (Fourteen) 14 days of receipt of written notice by the non-defaulting party calling upon the defaulting party to do so, the non-defaulting party shall be entitled to terminate this Agreement forthwith after the expiry of the said period of (Fourteen) 14 days. Termination shall not prejudice the non-defaulting party's rights under this Agreement to recover from the defaulting party any claim for damages for breach of contract or otherwise, but subject always to sub-clause (b) hereof.

> "(b) No claim for consequential loss shall lie against the defaulting party for any breach of this Agreement."

CMI was a body corporate of this State with its principal place of business located in Elkton, Maryland. It was engaged in the sale of platinum both before and after processing. CMI had purchased platinum from Sales, which had sought to negotiate a supply contract with CMI, and from Ayrton and other dealers, on a dealer's price basis. By letter agreement dated 3 October 1972 from Impala and accepted by CMI (the Agreement), CMI acquired all of the stock of Sales upon transfer of 45% of the stock of CMI to Impala.[4] Paragraphs 1, 2 and 4 dealt with the exchange of the stock and with who were to be the directors of Sales. Under paragraph 5 Sales continued to have the right to buy from Impala and Impala had the right to sell to Sales platinum "on the same terms as at present obtain." Impala reserved the right in paragraph 6 "to deal direct with companies engaged in the manufacture of automobiles in the U.S.A. who may require platinum or platinum group metals for the manufacture of catalytic converters for the control of exhaust emissions." Paragraph 7 "specifically recorded that [Impala's] subsidiary and agent in the United Kingdom, Ayrton . . . , has certain contractual obligations with various consumers in the United States of America and these will continue undisturbed by the arrangements set out above and neither [CMI] nor Sales . . . will have any entitlement to commission or other interest in respect of such sales. A list of these customers will be furnished." The list was furnished in a letter from Impala to CMI under date of 1 November 1972. It designated fourteen companies and specified the metal sold to each of them. Paragraph 8 read:

> "Subject to the provisos in Paragraphs 6 and 7 above, the intention of [CMI] and Impala . . . is that all further sales of platinum and platinum group metals in the American Continent shall be promoted through and effected by Sales . . . for the benefit of Impala . . . and [CMI]."

4. The letter, signed by Ian Greig, Deputy Chairman of Impala, to John P. Manley, Jr., President of CMI, began in Paragraph 1: "I refer to the discussions that we have had in regard to the expansion of our various interests for our mutual benefit and set out below our understanding of what has been agreed between us."

Paragraph 9 "specifically recorded that ... Sales ... is obligated to provide [Impala] with certain market intelligence and, at times, technical liaison with its customers in the U.S.A. for which a fee of U.S. $38,000 per annum is currently payable by [Impala]." By paragraph 10 Impala guaranteed to CMI "that for a period of three years after the sale of ... Sales ... to [CMI] the profits of ... Sales ... after charging all expenses, but before providing for taxation, including the fee of U. S. $38,000 per annum referred to in paragraph 9 above, will not be less in any twelve months' period than U. S. $120,000. Impala ... further hereby undertakes to make good any shortfall below the above mentioned figure of $120,000 within three months after the close of the twelve months' period. This undertaking shall continue until December 31, 1975 and shall continue thereafter indefinitely unless terminated by twelve months' prior notice." Paragraph 15 "specifically recorded that the present arrangements whereby Impala ... affords [CMI] 60 days credit on platinum or platinum group metals required for its own purposes shall remain unaltered by this agreement, but no discounts and/or rebates offered by Impala ... to Sales ... and/or [CMI] shall be available to both companies in respect of the same consignment of material."

The arrangement between Impala and CMI as evidenced by the Agreement did not work out as the parties apparently hoped. Early in 1975 Impala invoked the termination clauses of the Supply Contracts. On 14 January 1975 it gave Sales notice by registered mail in terms of clause 11 that the platinum Supply Contract and its amendment was terminated as of 31 July 1975. On 21 January it gave Sales notice in like manner and language of the termination of the palladium Supply Contract and its amendment. A copy of each letter was sent to CMI. On 21 January Impala also wrote Sales concerning the platinum Supply Contract. It asserted that Sales was in breach of clause 10 providing for payment within 30 days and declared that "pursuant to clause 16 (a) of the [Supply Contract] ... said agreement will terminate fourteen (14) days after your receipt of this notice, unless you cure the payment default hereinbefore indicated within said fourteen

(14) day period." On 14 February 1975 Impala gave like notice of the termination of the palladium Supply Contract. In the meantime, on 7 February, it had sued Sales for the money due for metals supplied.

The center of the controversy was the termination by Impala of its Supply Contracts with Sales which emasculated the Agreement between Impala and CMI, leaving CMI with no guaranteed quantity of platinum at producers' prices less 5%. Evidence adduced through testimony and documents during the eleven days of trial reflects the divergent claims of the parties with respect to the birth of the Agreement and its demise. We give a compendium of this evidence.

The Agreement, according to Impala, was the culmination of negotiations begun when its New York lawyers advised it to provide Sales "with a more American personality." CMI now alleges that the Agreement was sought by Impala "to mask its 'presence' in the United States" in anticipation of tax and anti-trust problems. Correspondence in July and August 1972 from Impala to Sales regarding the matter was sent to the home of the manager of Sales because it contained "points of reporting which might go against American Law. Impala cautioned Sales that care must be taken in the wording of letters between them. "From our side any actions which we wish to be taken will be passed on to you as suggestions. . . ." Impala told Sales that the "fundamental problem" was to give Impala a "cast iron defense if we were challenged in the U.S. Courts," and that the best solution seemed to be to effect a merger with an existing U. S. company. CMI was Impala's choice. On 11 August 1972, Impala wrote Sales: "Broadly speaking, what we have in mind is that we could offer [CMI] a business with an assured income plus financial backing and a guaranteed supply of metal." Sales replied on 23 August, affirming that CMI was a likely choice because it was "very dependent upon Impala . . . for its metal supply and should therefore at all times be amenable to its wishes." About the middle of September 1972, Impala sent Christian Jonker, then the Vice President and Manager of Sales, to CMI to relate Impala's offer to merge Sales with CMI. A further meeting was held at CMI on 3 October. Jonker, Ian Greig (Impala's

Deputy Chairman) and the three principals of CMI, John Manley (Chairman, President and Treasurer), Ron Davies (Vice President), and George Benvegno (Secretary) participated in the discussion. CMI believed that the entire value of Sales to CMI "lay in [CMI's] ability to earn commissions on the metals which they sold," so CMI was concerned about the duration and permanence of any agreement. Davies testified: "I was concerned that there be no termination clause. And I discussed that with my colleagues. When we thought the proposal over on our own and then subsequently in discussions with Mr. Greig, I said that I was happy to see there was no such termination clause. And he agreed that that was so." Greig was asked at trial if there had been any discussion regarding the terms or duration of the agreement. He replied: "I think later in the afternoon, either shortly before or shortly after signing, Mr. Davies said to me, 'Is this a permanent arrangement?' And I said, 'So far as anything in business is permanent, yes.' "

CMI's view is that the evidence showed that a condition precedent to payment under the Agreement was that commissions to be paid by Impala would be sufficient to cover the cost of the expanded enterprises of CMI and Sales including CMI's purchases of platinum for its own account, CMI losses, and CMI capital expansion. "The entire value of Sales . . . acquired by the [Agreement] for CMI, as admitted by Impala . . . via Jonker [later Assistant Marketing Manager of Impala] at trial, lay in the commissions which were to be generated by Sales . . . on all further sales of platinum group metals in the American Continents and that this joint venture would be permanent, in exchange for the permanent transfer to Impala . . . of 45 percent ownership in CMI." The Agreement came out of the meeting of 3 October.

It seems that all parties agree that the Supply Contracts between Impala and Sales were not discussed during the negotiations leading to the Agreement or prior to 16 November 1972 when settlement was made on the agreed exchange of stock. Impala says that "Greig would have had no hesitation about describing the terms of the September 1, 1972 agreements had he been asked whether there were such

agreements, but the subject was never brought up by CMI, and it did not occur to Greig to mention them." It alleges that "CMI knew that such supply contracts were customary, for the industry in general and for Impala in particular, and assumed that 'such terms as at present obtained' [set out in clause 5] might include metal allocations." Impala also points out that when CMI became the sole stockholder of Sales, it voted its three principals as members of Sales' board of directors and the board elected them into the offices of chairman, president, secretary and treasurer. They had full access to the files of Sales, which contained the Supply Contracts. To CMI, however, the existence of the Supply Contracts was "withheld" from it. It noted that, as anticipated by the Agreement, two Impala nominees, K.A.B. Jackson, Managing Director and Chief Executive of Impala (he said that he started that Company) and Jonker, Vice President and Manager of Sales, who later became Assistant Marketing Manager of Union Corporation, a subsidiary of Impala, were elected to the Board of Directors of CMI. Jackson was a director of CMI, Sales and Impala, and Jonker a director of Sales and CMI. CMI believed that the Contracts were inconsistent with the Agreement and with the representation of a permanent relationship with Impala.

After the 3 October Agreement, Impala's subsidiary, Ayrton, continued to sell metals. It is agreed by all parties that no commissions on any sales made by Ayrton were paid by Impala to Sales. Unknown to CMI, on 22 and 23 November 1972 Impala met with Universal Oil Products (UOP), a manufacturer of catalytic converters for use in automobiles, to discuss the sale by Impala to UOP of 90,000 ounces of platinum. On 24 November Arthur Byng Jackson of Impala and Jonker of Sales visited CMI. According to Impala, CMI requested that it or Sales be permitted to approach the United States customers who, prior to 3 October 1972 had been obtained by Ayrton, with respect to sales of metals other than those which had been the subject of previous sales and Impala turned down that request. Jackson described to CMI the negotiation of possible sales to UOP and explained that, "despite the exclusion for sales to automobile manufacturers,

such sales would literally be subject to a 5% price markup or commission to Sales . . . under the [Agreement] because UOP was not itself a manufacturer of automobiles." He added that Impala "legitimately could and would work out a deal by which the automobile manufacturing customers of UOP would themselves buy the metal from Impala (in which case clearly no 5% commission would be due to Sales . . .) and have UOP process it for them." Jackson proposed as an alternative that CMI agree to a contract revision to eliminate sales to UOP from coverage. Impala says that CMI so agreed. CMI asserts that no such agreement was reached since all parties anticipated a written memo containing the terms to be agreed upon. When the memo was received from Impala, its terms were never accepted as an amendment to the Agreement because they did not follow what had been discussed. A handwritten note written by Jonker at the bottom of one of the copies of the memo stated that there had been no discussion or decision on the provisions of the memo having to do with sales by CMI to Ayrton customers. CMI replied to Impala, refusing the terms, and, according to CMI, Impala acknowledged the refusal "and the matter of such an amendment to exclude UOP never came up again."

There was evidence tending to show that in May and October 1974, Impala, "dissatisfied with several developments," among them delay in payment for metals shipped to CMI, suggested termination of the Agreement. CMI rejected the proposal and Impala continued to perform under the Agreement through January 1975. In August 1974, and thereafter, when amounts due had substantially increased, Impala demanded a reduction in the overdue balance, pointing to regulations of South African authorities which required that the indebtedness not exceed $100,000. At CMI's request, Impala agreed that the overdue amount might remain as high as $200,000 provided it be reduced in periodic stages to $100,000 by December 1974. Sales did not adhere to this schedule and by the latter part of January the indebtedness was $730,141.18, $181,516.18 of which was sales to other customers of Sales for which the terms of payment were 30 days, and $548,625.00 of which was sales to CMI.

Impala, concluding that it could not collect what was due in the ordinary business way and no longer willing to continue to deliver metal for which it was not being paid, notified Sales, as we have indicated, that it was terminating the Supply Contracts.

CMI sees the events leading to the termination of the Supply Contracts differently. It refers to evidence showing that despite its refusal to amend the Agreement to permit Impala to sell to UOP without paying commissions to Sales, Impala entered into contracts with UOP for the sale of metals in April 1973 and July 1974. On 29 April 1974 Impala met with officers of the conglomerate, Pratt and Whitney, and unknown to CMI, agreed that Impala would enter into a letter of intent to sell $50,000,000 worth of platinum to that company. Two days later Jackson and Jonker met with CMI's officers at Elkton. Impala documented this meeting, by a confidential memorandum written by Jackson which stated in part that "the danger signals to [Impala's] marketing policy in the U.S.A. have been sounded loud and clear. There is a complete refusal at every meeting to see Impala's point of view and as the Elkton operation increases in profitability and complexity it will become more difficult to disengage. It would seem prudent to disengage from CMI by the end of this year. . . ." On 7 May 1974, Impala, through Jackson and Jonker, met with its attorneys in New York to discuss disengaging from CMI. At the time both Jackson and Jonker were on the board of directors of CMI and Sales. On 29 May Impala wrote CMI of its intent to disengage from the Agreement. CMI "replied with dismay and surprise at the unilateral intention to break their October 3, 1972 Agreement and emphasized CMI's wish to maintain the association as required by the . . . Agreement."

On 1 November 1974, after concluding a longer contract with UOP, Impala met in New York with CMI. Greig informed Manley, Davies and Benvegno that Impala intended to "disassociate" itself from the Agreement and regain "control" of Sales on terms which CMI termed as "unpleasant," and, in CMI's view, threatened "even less pleasant" alternatives if CMI refused Impala's proposed

route of disengagement. On 13 November 1974 Jackson wrote Greig that it appeared from information from Greig that CMI "has received the message loud & clear and that we will be able to disentangle ourselves from the present situation. . . . We still view a clean-cut with CMI, followed by a normal contract for [platinum] supply to CMI as an ordinary, but favored customer as the only acceptable way out. A second point is the future of [Sales] after the break with CMI. We would not wish to make any arrangements for new partners for [Sales] for a while. . . . We agree with your firm stand against CMI's demands regarding possible business with Pratt and Whitney and our possible future association with other companies. They should get the very clear message that we are getting out of the business associations with them and will only allow them a favored customer status in return."

CMI refused Impala's offer to compensate it for terminating the Agreement. Thereupon on 19 November 1974 Jackson informed Greig by intra-company telex:

> "In view of the anticipated reaction from CMI, we should cease communication with them and in January, 1975 use Clause 11, Page 4, to terminate the supply of metal to . . . Sales between now and August 1, 1975, the existing contracts between . . . Sales and its customers must be rewritten with whatever new company we establish in U.S.A. or Canada."

When the termination notices were sent to Sales by Impala, Impala telexed each of Sales' customers informing them that Impala had terminated its metal supply agreement with Sales as of 5 February 1975.

Impala asserts that "[f]rom and after January, 1975, Sales . . . simply stopped doing business. It made no efforts to sell metals, and placed no orders for metals with Impala. Nor did it make any effort to continue by using alternate sources of supply of platinum. . . ." According to CMI, Sales ceased doing business about 5 February 1975 because Sales had no metal at that time, Impala had terminated its supply, was no longer backing contracts between Sales and its customers,

and had so notified the customers. It was on 7 February 1975 that Impala sued Sales for unpaid balances on the common counts and filed an attachment on original process against CMI. CMI said the action was brought despite the fact that from 7 March 1973 to the date suit was filed, Impala had granted, and not revoked, credit to CMI for as long as it wished, provided it agreed to pay interest at varying and increasing rates on the balances.

## TRIAL BY A JURY

The threshold question is whether the action was subject to trial by a jury. Impala insists that it was not proper because (1) there was no valid election under Maryland Rule 343; (2) a jury is not proper in a suit of equity; and (3) CMI should not have been permitted to press before the jury a claim for breach of fiduciary relationship which it expressly abandoned in order to obtain a jury trial.

### (1)

On the day the declaration instituting the action was filed by Impala the sheriff was commanded by the court to summon Sales to the Circuit Court for Cecil County on the first Monday of March next, *i.e.,* 3 March, to answer the action. The summons informed Sales that it had fifteen days from the day named to answer or make its defense. The sheriff's return showed "Exit Summons by Certified Mail, Return Receipt Requested, Deliver to Addressee Only, 2/7/75." The declaration included a prayer for the issuance of a writ of attachment on original process and an affidavit in support thereof. The court ordered the issuance of the writ the same day. Maryland Code (1974, 1977 Cum. Supp.) §§ 3-301 to 3-305, inclusive, of the Courts and Judicial Proceedings Article; Maryland Rule, Chapter 1100, Subtitle G. Impala instructed the sheriff to serve the writ on CMI.

CMI filed three sets of documents in the Circuit Court for Cecil County, each set stamped by the clerk as received for record and recorded on 13 February 1975 at 3:57 p.m. In the order in which they were entered on the docket, the first was

entitled "ANSWER OF GARNISHEE TO ATTACHMENT." It asserted that Sales was never indebted as alleged and never promised as alleged and that CMI was not indebted to Sales. It set out other defenses on behalf of Sales and CMI going to the claim of Impala and the prayer for the writ of attachment. It included a certificate of notice that a copy had been mailed to Impala's counsel on 13 February. Attached as exhibits A and B were copies of the Supply Contracts.

The second set was entitled "PETITION OF COLONIAL METALS, INC. TO INTERVENE AS PARTY DEFENDANT AND COUNTER-CLAIMANT." CMI prayed that the petition for leave to intervene as a party defendant be granted "with leave to plead the attached counterclaim." It included a certificate of notice that a copy of the petition had been mailed to Impala's counsel on 13 February 1975. There were two attachments and various exhibits. The second attachment was an unsigned copy of a counterclaim of CMI against Impala and an unsigned copy of an election by CMI for a jury trial.

The third set was the original of the counterclaim of CMI. It was entitled "COUNTER CLAIM OF DEFENDANT, COLONIAL METALS, INC., FOR DAMAGES, DE-CLARATORY JUDGMENT, INJUNCTION AND OTHER RELIEF AGAINST PLAINTIFF, IMPALA PLATINUM, LIMITED." It claimed breaches of contract and fiduciary relationship by Impala. It sought (a) a declaratory judgment construing certain paragraphs of the agreement of 3 October 1972; (b) a declaratory judgment that Impala was in breach of that agreement and its fiduciary relationship with CMI; (c) an award of damages against Impala; (d) an accounting of monies received by Impala in violation of the agreement; (e) a declaration that Impala was constructive trustee for the benefit of CMI of all profits received by Impala for sales of its product in the United States in violation of the agreement; (f) a permanent injunction prohibiting Impala from further attempts to deny or refuse a source of supply of Impala's metals; (g) a permanent injunction prohibiting Impala from further sales of platinum in the United States in violation of the agreement; and (h) such other and further relief as justice may require. By a separate document entitled

"ELECTION FOR JURY TRIAL," CMI elected "to have the factual issues in this Suit tried by a Jury of twelve men and women." There were the same exhibits attached as accompanied the motion to intervene. There was also, on a separate page, a "CERTIFICATE OF NOTICE" certifying that a copy of the counterclaim was mailed to Impala's counsel on 14 February 1975. There is in the record an undated letter to the clerk of the court from Sales'. counsel reading: "Kindly attach the enclosed Certificate of notice to the counterclaim filed in the above referenced case by Defendant, Colonial Metals, Inc." This letter does not bear a stamp indicating when it was received by the clerk. There is also in the record, apparently with respect to the counterclaim, an "Affidavit of Compliance" indicating that a copy of the summons together with the original pleadings had been mailed to Impala on 10 February 1975. Attached is a United States Postal Service return receipt addressed to the clerk showing that the addressee had received the documents. The return receipt bore a stamp reflecting that it had been received by the clerk for record and recorded on 18 February 1975 at 11:15 a.m.

Maryland Rule 343 deals with the election of a jury trial. Section f 1 designates exceptions "generally" to the Rule:

"This rule shall not apply to issues from the Orphans' Court, to any proceedings under writs of attachment, or execution, or *scire facias,* or to any appeals with respect to which the procedure governing the exercise of the right to a jury trial, if any, is established by statute." [5]

Impala points out that Sales never prayed a jury trial, and claims that CMI failed to make an election for jury trial in accordance with the provisions of the Rule so that the right to a jury trial was waived. Sales and CMI urge that the "writ of attachment, or execution, or *scire facias*" exceptions of § f 1 dispose of Impala's argument. We do not agree. Clearly there was no proceeding under execution or *scire facias*. As

---

5. The only other exception pertains to actions from the District Court: "An action removed from the District Court shall be tried by jury." Maryland Rule 343 f 2.

for the writ of attachment, the short answer is that the attachment case was never tried. One of the few matters in this litigation in which the parties are not at odds is that it was agreed that the attachment case not be tried; only the claim and counterclaim went before the jury.[6] A proceeding under a writ of attachment was not involved in the trial.[7] We hold that the election of a jury trial was governed by Rule 343.

Section a of Rule 343 concerns the requirement of an election of jury trial and the form of request:

> "An action at law shall be tried before the court without a jury unless an election be made, in person or by attorney, for a jury as hereinafter provided. Such election shall be in writing separate and distinct from the body of the pleadings but may be included at the end of any pleading with an appropriate heading, and, where a certificate of service is required, immediately preceding same."

Sections b and c mandate the time for election, § b by a plaintiff and § c by a defendant. Section b reads:

> "A plaintiff shall make such election at the time of filing of the original declaration. In all cases where a new plaintiff, other than a successor in interest of an original plaintiff, shall become a party such new plaintiff shall make the election within fifteen days after becoming a party."

---

6. Agreement of the parties that the attachment case was not to be tried with the claim and counterclaim was apparently reached in discussions of counsel with their subsequent representations in chambers to the trial judge. The discussions and representations were not recorded. Although the fact that the attachment case was not tried with the claim and counterclaim is not in conflict, the basis on which it was agreed not to then try it is disputed. CMI urges that the agreement reached did not go so far as to permit the entry of a judgment of condemnation without a trial on that issue. Impala's understanding is that it did permit the entry of such judgment: "[C]ounsel agreed that the outcome of the short note case of Impala against Sales would be decisive as to the proper result in the garnishment action; so that counsel could ascertain, and work out between themselves, the only proper disposition, once it was known what the disposition was in the short note case."

7. In the circumstances, we do not consider whether "proceedings under writs of attachment" appearing in Rule 343 f 1 includes both writs of attachment on original process and writs of attachment on judgments.

Section c reads:

> "A defendant, including a third party, shall make such election at or before the time for filing his first responsive pleading to the merits, which places the case at issue as to him."

As we have indicated, Impala instructed the sheriff to serve the writ of attachment on CMI. It is manifest that this was done on or before 13 February 1975, as on that date CMI, as garnishee, answered the attachment. We think that CMI became a party to the action when it was served with the writ of attachment and that its status as a party was that of a defendant. *See* Rule 5 j. Over three-quarters of a century ago in *Albert v. Albert,* 78 Md. 338, 28 A. 388 (1894) our predecessors found it to be "well settled" that

> "a garnishee stands, in all respects, in a situation exactly similar to that of a defendant debtor. He may contest the claim made against him, but if he does so he is liable to costs. He may not only defend his own interest as a mere neutral in the controversy between the plaintiff and the defendant, but he may assume the character of an ally of the defendant. He is allowed to plead and defend his rights, for him and in his behalf." *Id.* at 346.

Rule G 52 a fully recognizes the teaching of *Albert* in providing that "[t]he garnishee may file a pleading asserting on behalf of the defendant any defense which the defendant could assert, and also any defense on his own behalf." Even if CMI did not so attain the status of party defendant in the case, it had the right, upon timely application, which it made, to intervene in the action. Rule 208 a and c 1. It became a party defendant beyond question upon the order of the trial court granting it leave to intervene and designating it as a defendant. Rule 208 c 2; *Elliott v. Larrimore,* 203 Md. 526, 530, 101 A. 2d 817 (1954).

Since CMI was a defendant subject in regard to the election of jury trial to Rule 343, the question is whether there was

compliance with the relevant provisions of that Rule. CMI clearly made an election for a jury trial in a writing separate and distinct from the body of the pleadings as required by § a. The issue is whether the election was made "at or before the time for filing [its] first responsive pleading to the merits, which place[d] the case at issue as to [it]," as prescribed by § c. This entails two initial determinations: (a) what was the first responsive pleading to the merits which placed the case at issue as to CMI; and (b) what is meant by "at or before the time for filing" that pleading.

### (a)

We find that the first responsive pleading to the merits which placed the case at issue as to CMI was that entitled "ANSWER OF GARNISHEE TO ATTACHMENT." Despite its title, it was this pleading, and no other, which pleaded the common counts and asserted other defenses to the claim of Impala on behalf of both Sales and CMI. Thus, it responded to the merits of Impala's claim and placed the case at issue as to the defendants. The counterclaim filed by CMI, on the other hand, was no more than what it purported to be, a claim CMI alleged it had against the opposing party, Impala. *See* Rule 314 a 1. It cannot in any way be construed as a responsive pleading to the merits which placed the case at issue as to CMI.

### (b)

The history of Rule 343 is traced in 3 Poe's Pleading and Practice § 249 (Sachs 6th ed. 1975). Section 39 of Article IV of the Constitution of Maryland was adopted by Acts 1892, ch. 313, ratified 7 November 1893. It provided, *inter alia,* that the Supreme Bench of Baltimore City could require, by rule, causes in the courts of Baltimore City to be tried by the court without a jury, unless a litigant, within such time as may be prescribed, elected to have the cause tried before a jury. The Supreme Bench of Baltimore City, apparently pursuant to this constitutional authority, adopted its Rule 50, later Rule 545. It included provisions for the time of election by a

plaintiff and by a defendant. As quoted in *Baltimore City v. Thomas,* 115 Md. 212, 214, 80 A. 726 (1911), it read:

> " 'As to plaintiffs, such election shall be made by the plaintiffs, or any of them, not later than fifteen days after the filing of the declaration. In all cases where a plaintiff or plaintiffs shall be brought in by amendment, any such new plaintiff shall so elect within five days after being made a party.
>
> " 'As to defendants, such election shall be made by the defendants, or any of them, at or before the time of first filing a plea, but in no event after the time allowed by law to plead. . . .' "

*See Houston v. Lloyd's,* 241 Md. 10, 18, 215 A. 2d 192 (1965). Baltimore County adopted a rule "very likely . . . copied, almost verbatim, from the city rule. . . .", *Houston* at 18, but without constitutional provision therefor. We upheld the constitutionality of the rule on the rationale that constitutional authority was not required because there was no deprivation of a jury trial required by the Constitution but merely the requirement to make a timely election which made for a more orderly progress of a case in the courts. *Id.* at 11-24.[8] It was following the decision in *Houston* that we adopted Rule 343 pursuant to the 34th Report of the Standing Committee on Rules of Practice and Procedure, effective 1 April 1969. *See Elmore v. Reese,* 268 Md. 490, 493, 303 A. 2d 381 (1973); *Md. Community Dev. Inc. v. S. R. C.,* 261 Md. 205, 211, 274 A. 2d 641, *appeal dismissed,* 404 U. S. 803, 92 S. Ct. 62 (1971). According to Poe, *supra,* § 249, Rule 343 was patterned after the earlier Supreme Bench of Baltimore City rule.

We construed the time of election requirements of the Supreme Bench rule in *Thomas, supra,* in holding that a demurrer was not a "plea" within the contemplation of the rule. We said:

> "The rule seems to us to clearly mean, that if a defendant desires to elect a jury trial, he must do so

---

8. Seventh Circuit Rule 547 a 2 also "required that a demand for a jury trial on behalf of a defendant be made at or before the first filing of a plea

when he first files a plea, even if that plea is filed before the regular rule day, and he must at all events make such election by the time he is allowed by law to file his plea." *Id.* at 216.

For other discussions of the rule *see Condon v. Gore,* 89 Md. 230, 42 A. 900 (1899); *City Pass. Ry. Co. v. Nugent,* 86 Md. 349, 38 A. 779 (1897).

Although Rule 343 may have been patterned after the earlier Supreme Bench rule which we construed in *Thomas,* there are significant differences in the two rules in the wording of the provisions regarding the time for election by a defendant. The Supreme Bench rule required that such election be made *"at or before the time of first filing a plea,* but in no event after the time allowed by law to plead. . . ." (Emphasis added). Our construction in *Thomas* is entirely consistent with this wording. Rule 343, however, provides that a defendant shall make such election *"at or before the time for filing his first responsive pleading* to the merits, which places the case at issue as to him." This, we believe, does not mean that the election must be made *at the time of filing* such first responsive pleading. The clear import of the language, we think, is that, although it *may* be made simultaneously with such first responsive pleading, it need not be. It may also be made at any time during the period allowed for the filing of such responsive plea. Thus, the election may be made at or after the filing of the plea, provided it is within the time *for filing* the plea.

Our view is supported by the obvious distinction between the time for election required of a plaintiff vis-à-vis a defendant. A plaintiff must elect at the time *of* filing his original declaration; a defendant must elect at or before the time *for* filing his plea. Had we meant for the defendant to elect at the time of filing his plea, it would have been easy for us to so state. Our view is also supported by the comparable Maryland District Court Rule. MDR 343 b requires, similar to Maryland Rule 343 b, that a plaintiff file

on the merits, but not after the time for filing a plea to the merits." Elmore v. Reese, 268 Md. 490, 493, 303 A. 2d 381 (1973).

an election "with his statement of claim. . . ." MDR 343 c, on the other hand, permits the election to be made by a defendant "within the time prescribed for filing [notice of intention to defend]." The election need not be made *with* or *at the time* the notice to defend is filed. Our interpretation of Maryland Rule 343 c makes consistent the time for election of jury trial by a defendant, as well as by a plaintiff, in both the circuit courts and the Maryland district courts. *Bettum v. Mont. Fed. S. & L. Ass'n,* 262 Md. 360, 277 A. 2d 600 (1971) does not compel a contrary view. We indicated in *Bettum* that a local rule of court requiring that an affirmative written election for a jury trial be made *at the time of filing of the first pleading* had been made applicable to all courts by Rule 343. *Id.* at 366. But we were there speaking in terms of a plaintiff, and what we said was correct in that context. Nor are *Bringe v. Collins,* 274 Md. 338, 335 A. 2d 670 (1975) and *Fallon v. Agency Rent-A-Car,* 268 Md. 585, 303 A. 2d 387 (1973) apposite. In the first, an election by the defendant was not filed under MDR 343. *Bringe* at 347-350. In the second, involving two cases which had been consolidated, the defendant failed to elect within the time prescribed by MDR 343, and we held that she could not obtain indirectly, by consolidation with the second case, that which she had already waived. *Fallon* at 588.

Our inquiry has boiled down to whether CMI made its election for jury trial before the time for filing its first responsive pleading to the merits in the short note case, which placed that case at issue before it. We have heretofore agreed with Impala's contentions that CMI was subject to Rule 343 as a party defendant and that the exceptions spelled out in § f 1 of that rule were not here applicable. We have also agreed with Impala's claim that the document entitled "ANSWER OF GARNISHEE TO ATTACHMENT" was the first responsive pleading to the short note case and that no election for jury trial accompanied it. We accept, *arguendo,* but only for the purpose of decision, Impala's statement that it did not waive any failure on the part of CMI to make a timely election of a jury trial and Impala's suggestion that CMI wrongfully asserted that Impala delayed raising the

question of CMI's right to a jury trial until the first court day. Impala also alleged:

> "[N]o matter how things are viewed, or whatever criterion is applied, the Election for Jury Trial accompanying CMI's Counterclaim had no legal existence or effect until, at the very earliest, February 14, 1975, when [the court] signed the order granting leave to intervene. Its effective life may only have commenced on February 18, 1975, which was the first time at which the clerk was provided with the requisite proof of service under Rule 306 a 2."

We further accept, *arguendo,* but only for the purpose of decision, the later time as the date on which the election was made. Even in the light of our agreements with and *arguendo* acceptances of all of these contentions of Impala, we do not agree that CMI failed to make adequate timely election for a jury trial. It is patent that the election by CMI, even as Impala views it, was made well within any period in which CMI was required to answer. *See* Rules G47 and G48. As we read Rule 343 this was in full compliance with the time prescribed by § c. We find that the election for jury trial by CMI was properly made. We hold that the trial court did not err in ruling that, with respect to Rule 343 c, CMI and Sales were entitled to a jury trial.

### (2)

The second reason advanced by Impala to support its claim that it was improper to try the case before a jury is that a jury is not proper in a suit in equity. It urges that CMI's original counterclaim was "classically equitable in form," conforming to bills of complaint and not to declarations at law. Impala argues that the counterclaim sought "typical equitable relief. . . ." and added "a demand for monetary damages as customarily may be and is done in an equitable bill of complaint." Impala concludes: "Where one has filed a bill in equity, it is immaterial whether a demand for a jury

trial has been filed either timely or untimely. The demand is inappropriate and irrelevant since equity does not try cases to a jury."

"The constitutional guarantee of a trial by jury extends only to the type of cases in which the right of a trial by jury existed at the time of the adoption of the constitution." *Commonwealth of Penna. v. Warren,* 204 Md. 467, 474, 105 A. 2d 488 (1954). In this State there is no right to a jury trial in a court of equity. *Village Books v. State's Attorney,* 263 Md. 76, 94, 282 A. 2d 126 (1971), *vacated and remanded,* 413 U. S. 911, *aff'd on remand,* 269 Md. 748, 310 A. 2d 48 (1973), *cert. denied,* 418 U. S. 930 (1974); *Baker v. Safe Dep. & Trust Co.,* 93 Md. 368, 381, 49 A. 623 (1901); *Barth v. Rosenfeld,* 36 Md. 604, 613, (1872); *Hilleary v. Crow,* 1 Harr. & J. 542, 544 (1804). The action filed by Impala on assumpsit was properly docketed on the law side of the court. Maryland Rule 340 b. The counterclaim filed by CMI was amended and, as amended, contained six counts. Count I was in substance as originally filed and prayed the same relief. Counts II through VI alleged respectively "Malicious Interference with Business," "Misrepresentation," "Negligence," "Fraud," and "Negligent Misrepresentation." For relief, each of Counts II and III prayed an accounting of profits and compensatory and punitive damages. Each of Counts IV and VI prayed damages. Count V prayed compensatory and punitive damages. When the case came on for trial, CMI, apparently to counter Impala's argument that a jury trial was not proper because the amended counterclaim of CMI was equitable in nature, moved, and was granted leave to strike all relief prayed under the various counts except that for damages. The effect was that all of the equitable relief prayed under the counterclaim was deleted.[9] Impala expressly did not object to

---

9. As to Count I, the request for a declaratory judgment construing certain paragraphs of the Agreement of 3 October 1972, for a declaratory judgment that Impala breached the contract and its fiduciary relationship, for an accounting of money received in violation of certain paragraphs under the contract, for a declaration that Impala was a constructive trustee of CMI for certain profits, for a permanent injunction against further attempts by Impala to deny a source of supply of Impala's platinum, for a permanent injunction against Impala from further sales of its platinum in the United States in violation of the contract, and for further relief, clauses (a), (b), (d),

this, but did preserve its objection to the ruling of the court immediately before that CMI and Sales were entitled to a jury trial in this case.[10] At the completion of CMI's case in chief, directed verdicts were granted on all counts of the amended counterclaim except Count I (breach of contract) and Count V (fraud).

The short answer to Impala's contention is that, in the circumstances, any relief or remedy to which Impala, Sales or CMI may have been entitled was properly on the law side of the court with the right to trial by jury. There was no call to invoke Maryland Rule 515 to transfer the action to the equity side.[11]

## (3)

The third reason advanced by Impala in support of its contention that a trial by jury was improper does not go directly to that question. Rather, it proceeds on the basis that even if a jury trial were properly elected by CMI, even if the counterclaim were properly cognizable at law, and even if there were a fiduciary relationship between Impala and CMI with a duty to disclose the existence of the Supply Contracts,

---

(e), (f), (g) and (h) respectively of the amended counterclaim, were stricken, leaving only clause (c) for damages. An accounting of profits prayed under clause (a) in each of Counts II and III was stricken.

**10.** The court, noting that CMI filed an election for a jury trial "at the same time" it filed its counterclaim, ruled "that the election wasn't required at the time of the filing of the Answer to the Attachment, but at the first initial pleading of the Counterclaim. They complied with the Rule 343 c." As we have indicated, we agree that there was compliance with the Rule. We are not in accord with the basis stated by the court for such compliance.

**11.** *See* National Park Bank v. Lanahan, 60 Md. 477, 510 (1883) which held that "the question of fraud is one which may be tried in a court of law as well as in equity," and Dairy Queen v. Wood, 369 U. S. 469, 477, 82 S. Ct. 894 (1962) which asserted that "it would be difficult to conceive of an action of a more traditionally legal character" than an action on a debt allegedly due under a contract.

*See also* Shultz v. Kline, 552 S.W.2d 333 (Mo. App. 1977) and Jaycox v. Brune, 434 S.W.2d 539 (Mo. 1968). In *Shultz,* although the original petition sought only equitable relief, the court lost equitable jurisdiction when the plaintiff filed an amended petition seeking non-equitable relief superceding the first petition, and the defendant counterclaimed for non-equitable relief. When the cause went to trial purely on the legal issues involved in the counterclaim, it was held that the plaintiff was entitled to a jury trial. In *Jaycox,* on dismissal of the first count containing an equitable claim, the court lost its equity jurisdiction and the plaintiff was entitled to a jury trial on the second count which was for a money judgment for services rendered.

CMI should not have been permitted to present the matter of fiduciary relationship to the jury as it "waived the equitable claim of fiduciary relationship in order to secure a jury trial...." It was Impala's notion that the Agreement with CMI was not breached because it had properly terminated the two Supply Contracts with Sales and therefore was not obligated to supply platinum to Sales. CMI answered this by urging that Impala could not rely upon its Supply Contracts with Sales in defense of CMI's counterclaim because the Supply Contracts had not been disclosed to CMI. The question of disclosure of the Supply Contracts, CMI alleged, concerned whether a fiduciary relationship existed between Impala and CMI.

Impala introduced into evidence its Supply Contracts with Sales in defense of CMI's counterclaim of breach of contract. CMI's position is that "[i]t was because of [Impala's] reliance upon the termination provisions of the supply contracts that the Jury had before it the factual issue of the disclosure *vel non* of the Supply Contracts on the duty *vel non* of [Impala] to so disclose them to CMI."

The Court has upheld and consistently applied the definition of equitable estoppel contained in 3 J. Pomeroy, Equity Jurisprudence § 804 at 189 (5th ed. 1941):

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

*See Dahl v. Brunswick Corp.,* 277 Md. 471, 487, 356 A. 2d 221 (1976); *Savonis v. Burke,* 241 Md. 316, 319, 216 A. 2d 521 (1966) and cases therein cited. "Estoppel is cognizable at common law either as a defense to a cause of action, or to avoid a defense...." *Bitting v. Home Ins. Co.,* 161 Md. 56, 60, 155

A. 329 (1931) and cases therein cited. There may be an estoppel to prevent a party from relying upon a right of property or contract, or of remedy both at law or in equity. *Kline v. Lightman,* 243 Md. 460, 474, 221 A. 2d 675 (1966). *See Machovec v. Shipley,* 171 Md. 339, 344, 189 A. 223 (1937). "Equitable estoppel operates as a technical rule of law to prevent a party from asserting his rights where it would be inequitable and unconscionable to assert those rights. . . . It is essential for the application of the doctrine of equitable estoppel that the party claiming the benefit of the estoppel must have been misled to his injury and changed his position for the worse, having believed and relied on the representations of the party sought to be estopped." *Savonis,* 241 Md. at 319-320 and cases therein cited. Mere silence will generally not raise an estoppel against a silent party. *See Mohr v. Universal C.I.T. Corp.,* 216 Md. 197, 205, 140 A. 2d 49 (1958) and cases therein cited. "[T]he doctrine is only applicable when there is a duty imposed upon the party remaining silent to speak. . . ." *Mason v. Dulaney,* 144 Md. 108, 114, 124 A. 390 (1923). Whether an estoppel exists is a question of fact to be determined in each case. *Addressograph-Multigraph v. Zink,* 273 Md. 277, 282, 329 A. 2d 28 (1974); *Bean v. Steuart Petroleum,* 244 Md. 459, 469, 224 A. 2d 295 (1966); *Travelers v. Nationwide,* 244 Md. 401, 414, 224 A. 2d 285 (1966). We think that under a fair reading of the court's charge, it embodied these principles of equitable estoppel.

The issue of breach of fiduciary relationship was also properly before the jury in connection with Count V (fraud). In its Amended Counterclaim, as part of its claim of fraud, CMI alleged that prior to 3 October 1972, Impala was aware of the Supply Contracts and failed to disclose them to CMI. Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure. *See Walsh v. Edwards,* 233 Md. 552, 567, 197 A. 2d 424 (1964); *Fegeas v. Sherrill,* 218 Md. 472, 476, 147 A. 2d 223 (1958). CMI raised the issue of fiduciary relationship in order to show that Impala had a duty of disclosure. Such a duty may arise out of a fiduciary relationship. *See Herring v. Offutt,* 266 Md. 593, 597, 295 A.

2d 876 (1972); *Allen v. Steinberg*, 244 Md. 119, 128, 223 A. 2d 240 (1966); *Hambleton v. Rhind*, 84 Md. 456, 487, 36 A. 597 (1897). A fiduciary relationship "carries with it the requirement of utmost good faith and loyalty and the obligation of [the fiduciary] to make full disclosure of all known information that is significant and material to the affairs . . . of [the fiduciary relationship] . . . 'the principle of utmost good faith covers not only dealings and transactions occurring during the [fiduciary relationship] but also those taking place during the negotiations leading to the formation of the [fiduciary relationship].' *Allen v. Steinberg, supra* at 128"; *Herring* at 597.

## THE JUDGMENTS

The trial court required the jury to return special verdicts in the form of written findings upon certain issues of fact. Maryland Rule 560 a 2. In submitting the issues to the jury, the court, pursuant to Maryland Rule 560 a 3, gave explanations and instructions. The charge was comprehensive, fully complying with the Rule's dictate that "[t]he court shall give to the jury with such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue." We see no reversible error in the instructions.

Six issues were submitted to the jury. Issue No. 1 concerned the claim of Impala against Sales: "Is . . . Sales justly indebted unto Impala . . . for metals sold and delivered to . . . Sales?" The jury answered, "No." It, therefore, did not reach the second part of the issue: "If Yes, in what amount?" or Issue No. 2 concerning interest to be awarded if the answer to Issue No. 1 was "Yes." Issues Nos. 3, 4 and 5 concerned Count I of the counterclaim of CMI against Impala. Issue No. 3 read: "Did a fiduciary duty exist between the parties in their negotiations of the October 3, 1972 Agreement?" The jury answered "Yes." Issue No. 4 asked: "If there was such a duty and your answer to Issue No. 3 is 'Yes', was it breached by Impala. . . .?" The jury answered "Yes." Issue No. 5 contained two parts. The first was: "Did Impala . . . breach any of the terms of its Agreement with [CMI] dated October 3, 1972?"

The jury answered "Yes." The second part called upon it to assess the damages if the answer to part one was "Yes." It did so in the amount of $1,848,580. Issue No. 6 concerned Count V of the counterclaim. It also was in two parts. This issue first asked the jury: "Was Impala ... guilty of fraud in its negotiations with [CMI], culminating in the Agreement of October 3, 1972?" The answer was "Yes." The jury was then called upon to determine the amount of damages. It found compensatory damages in the amount of $253,732 and no punitive damages.

At the close of all the evidence Impala renewed a motion for summary judgment on its case against Sales and two motions for directed verdict with respect to Counts I and V which remained open on the counterclaim of CMI. The trial court reserved its rulings. After the jury had rendered its verdicts, the court granted the motion for summary judgment and entered a judgment n.o.v. for Impala against Sales in the amount of $730,141.18 together with interest at 6% per annum accounting from 7 February 1975. It denied the motions for directed verdict as to Counts I and V of the counterclaim of CMI, so "that judgment ... rendered by the Jury with regard to the first count which is breach of contract in the amount of $1,848,580 and with regard to Count 5, which was the fraud count, in the amount of $253,732 making a total of $2,102,312, will stand." The court directed the clerk to record the judgment in the amount of $2,102,312 in favor of [CMI] against Impala. . . ."

*The Judgment n.o.v. on Impala's Claim.*

The grant of a judgment n.o.v. is dependent upon the denial of a motion for a directed verdict made at the close of all the evidence. Maryland Rules 563 a 1, a 2 and 552 a. A motion for judgment n.o.v. cannot be considered, much less acted upon, unless the record discloses the denial of a motion for a directed verdict made at the close of all the evidence. *Drug Fair v. Smith,* 263 Md. 341, 356, 283 A. 2d 392 (1971); *Glover v. Saunders,* 252 Md. 102, 105, 249 A. 2d 156 (1969); *Hajewski v. Baltimore County,* 184 Md. 161, 165, 40 A. 2d 316 (1944). The record here, as reflected in the joint record extract, does

not show the denial of a motion for a directed verdict made at the close of all the evidence. The court, however, granted Impala's motion for summary judgment. Maryland Rule 610. Summary judgment procedure under this Rule is not a substitute for trial, but rather is a determination of whether there are disputed issues of fact that should be tried. *Merchants Mortgage Co. v. Lubow,* 275 Md. 208, 217, 339 A. 2d 664 (1975); *Greenwell v. American Guaranty,* 262 Md. 102, 109, 277 A. 2d 70 (1971). *Kirsner v. Fleischmann,* 261 Md. 164, 169, 274 A. 2d 339, *cert. denied,* 404 U. S. 856 (1971). The purpose of a hearing on a motion for summary judgment at the trial level is not to try the case on its merits, but rather to decide whether any real dispute as to material facts exists. *Shatzer v. Kenilworth Warehouses,* 261 Md. 88, 94-95, 274 A. 2d 95 (1971); *Brown v. Suburban Cadillac, Inc.,* 260 Md. 251, 254-255, 272 A. 2d 42 (1971). Properly granted summary judgments do not usurp any jury function. *Dietz v. Moore,* 277 Md. 1, 4, 351 A. 2d 428 (1976). The court does not attempt to decide any issue of fact or credibility, but only whether such issues exist. *Wolfe v. Lamar & Wallace, Inc.,* 261 Md. 174, 177-178, 274 A. 2d 121 (1971). *See Washington Homes v. Inter. Land Dev.,* 281 Md. 712, 715-718, 382 A. 2d 555 (1978). On the other hand, a motion for a directed verdict or for a motion n.o.v. tests the legal sufficiency of the evidence. *See Beahm v. Shortall,* 279 Md. 321, 341-342, 368 A. 2d 1005 (1977); *Levine v. Rendler,* 272 Md. 1, 12, 320 A. 2d 258 (1974); *Katz v. Holsinger,* 264 Md. 307, 311, 286 A. 2d 115 (1972) and discussion *infra.* "Instead of granting or denying the motion for a directed verdict, the court may submit the case to the jury and reserve its decision on the motion until after the verdict or discharge of the jury, but for the purpose of appeal such reservation constitutes a denial of the motion, unless judgment is rendered for the moving party pursuant to Rule 563 (Judgment N.O.V.)." Rule 552 c. In contrast, a summary judgment "sought shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 610 d 1. It is readily

apparent, therefore, that summary judgment procedure is so clearly distinguishable from a motion for a directed verdict, that the grant of summary judgment cannot serve as the basis for a judgment n.o.v. Here, the trial court had no authority to enter the judgment n.o.v. upon grant of the motion for summary judgment, absent a denial of a motion for a directed verdict, and we reverse the judgment n.o.v. We note that the grant of a motion for summary judgment does not of itself constitute the entry of final judgment from which an appeal may be made. *Felger v. Nichols,* 30 Md. App. 278, 279, 352 A. 2d 330 (1976).

In any event, we believe that the grant of the motion for summary judgment was improper. We find that the pleadings, depositions and admissions on file showed that a genuine dispute as to material facts existed regarding the monies claimed by Impala to be due it by Sales. Furthermore, even if the grant of the motion for summary judgment be deemed to be compliance with the denial of a directed verdict requirement of Rule 563 a 1 as the basis for a judgment n.o.v., we think that the trial court erred in granting the judgment n.o.v. The general rule by which the sufficiency of the evidence is to be tested on appellate review is the same for a judgment n.o.v. and a directed verdict. The evidence and the reasonable inferences to be drawn from it are to be considered in the light most favorable to the party opposing the motion. *Wesko v. G. E. M., Inc.,* 272 Md. 192, 200, 321 A. 2d 529 (1974); *Gill v. Computer Equip. Corp.,* 266 Md. 170, 173, 292 A. 2d 54 (1972); *Wheeler v. Katzoff,* 242 Md. 431, 435, 219 A. 2d 250 (1966); *Safeway Stores v. Bolton,* 229 Md. 321, 326, 182 A. 2d 828 (1962). A party is not entitled to judgment n.o.v. unless the facts and circumstances so considered are such as to permit of only one inference with regard to the issue presented. Here, the evidence and all inferences fairly deducible therefrom were sufficient to lead to conclusions from which reasonable minds could differ, so that the issue was not one of law for the court but was one of fact for the jury with the weight and value of such evidence left to the jury. *See* discussion of directed verdict *infra.*

### The Directed Verdicts on CMI's Counterclaim

As with respect to a judgment n.o.v., in considering a motion for a directed verdict the trial court assumes the truth of all credible evidence on the issue and of all inferences fairly deducible therefrom, and considers them in the light most favorable to the party against whom the motion is made. *Dix v. Spampinato,* 278 Md. 34, 37, 358 A. 2d 237 (1976); *D. C. Transit System v. Brooks,* 264 Md. 578, 580, 287 A. 2d 251 (1972); *Stoskin v. Prensky,* 256 Md. 707, 709, 262 A. 2d 48 (1970); *P. Flanigan & Sons v. Childs,* 251 Md. 646, 653, 248 A. 2d 473 (1968); *Hogan v. Q. T. Corporation,* 230 Md. 69, 74, 185 A. 2d 491 (1962); *Campbell, Etc. v. Patton,* 227 Md. 125, 134, 175 A. 2d 761 (1961). If there is any legally relevant and competent evidence, however slight, from which a rational mind could infer a fact in issue, then a trial court would be invading the province of the jury by declaring a directed verdict. In such circumstances, the case should be submitted to the jury and a motion for a directed verdict denied. *Snoots v. Demorest,* 254 Md. 572, 575, 255 A. 2d 12 (1969); *Lumbermens Mut. Cas. Co. v. Ely,* 253 Md. 254, 263, 252 A. 2d 786 (1969); *Jacobson v. Julian,* 246 Md. 549, 555-556, 229 A. 2d 108 (1967); *Plitt v. Greenberg,* 242 Md. 359, 367-368, 219 A. 2d 237 (1966); *Smack v. Jackson,* 238 Md. 35, 37, 207 A. 2d 511 (1965); *Dunnill v. Bloomberg,* 228 Md. 230, 233, 179 A. 2d 371 (1962).

Impala presents seven questions, numbered 2 through 8 in its brief, going to the issues determined by the jury pertaining to CMI's counterclaim. In denying the motions for directed verdicts the court said:

"Now, with regard to the Motions for Directed Verdicts as to Counts 1 and 5 of the counterclaim, of [CMI], the court is of the opinion that there was sufficient evidence in the case to be submitted to the Jury on the questions raised or the claims made under these two counts, and that the matters were fairly submitted to the Jury on the issues which were propounded to them. And, the court therefore believes that there was sufficient evidence upon

> which the Jury could act in these matters to sustain the verdict and judgments which they rendered."

We agree. In considering the propriety of the trial court's ruling on a motion for directed verdict, this Court, as well as the lower court, is obliged to assume the truth of all evidence tending to sustain the party against whom the motion is directed, as well as all inferences of fact reasonably and fairly deducible therefrom. *Fleming v. Prince George's County,* 277 Md. 655, 658, 358 A. 2d 892 (1976); *Taylor v. Armiger,* 277 Md. 638, 640, 358 A. 2d 883 (1976); *Summit Loans, Inc. v. Pecola,* 265 Md. 43, 46, 288 A. 2d 114 (1972); *Wood v. Johnson,* 242 Md. 446, 452, 219 A. 2d 231 (1966); *Smith v. Bernfeld,* 226 Md. 400, 405, 174 A. 2d 53 (1961). Following this dictate, we find that the issues and the matters covered by them, inherently including the questions Impala propounds, were all properly submitted to the jury under the trial court's explanations and instructions. It is manifest that, with respect to the points raised by Impala, the evidence, and all inferences fairly deducible therefrom, viewed in a light most favorable to CMI, led to conclusions from which reasonable minds could differ, and, thus, the issues were not ones of law for the court, but were ones of fact for the jury with the weight and value of such evidence left to it. We hold that the court did not err in denying the motions for directed verdict.

### The Expert Testimony

In its argument Impala claims that the testimony of Benjamin J. Smith, Jr., an expert witness, who expressed an opinion as to the present value of lost income to [CMI] should not have been received as "based on clearly fallacious assumptions and . . . so inherently speculative and uncertain as to afford no basis for a finding of fact as to the amount of any lost profits." Impala urges that the trial court erred in denying the motion to strike.[12] Smith was an appraiser

---

12. The court charged:

"Now, with regard to the testimony of Mr. Smith, who testified as an expert and expressed an opinion as to the present value of lost income to [CMI], you are instructed that you should give no more weight to the testimony of an expert than any other witness. In

employed by the American Appraisal Company of Milwaukee, Wisconsin, which "makes appraisals for the public and the private sectors . . . for all purposes. Appraisals would be for possible sale or acquisition, financing, or *ad valorem* taxes or insurance." [13] Upon submission of the witness on voir dire, Impala expressly made no objection to his qualifications.[14]

Smith testified that he had prepared an appraisal report, spending 21 days in the investigation, the appraisal and the final report. He gave in detail the various steps in the investigative process leading to his opinion that the fair market value of lost profits was $1,350,000.

In this State three rules are followed which limit the recovery of unrealized profits: (1) a plaintiff must show that a breach by the defendant was the cause of the loss; (2) damages may not be awarded unless, when the contract was executed, the defendant could have reasonably forseen that the loss of profits would be a probable result of a breach; and (3) lost profits may not be recovered unless they can be proved with "reasonable certainty," as distinguished from "certainty." *M & R Builders v. Michael,* 215 Md. 340, 345-349, 138 A. 2d 350 (1958).[15] We pointed out in *M & R Builders* that

---

considering the weight to be given the opinion of an expert, his opinion is no better than the reasons he gives to support it. So, you should consider carfully the reasons given by Mr. Smith in his testimony to support his opinion and give it such weight as you think it rightfully deserves."

**13.** Smith testified that the American Appraisal Company "is the largest and the oldest appraisal firm in the United States. It has offices in over 26 of the major cities in the United States. And in addition to these offices, it has offices in Italy and France and Spain. And we have affiliations in Canada, Mexico, Rio de Janeiro, the Far East and in Europe. We have employees of approximately 350 in the American Appraisal Company, of which about 130 are professional appraisers."

**14.** We reject CMI's claim that the sufficiency of the evidence was not ruled on below and that Impala failed to make timely objection to the expert's testimony. It appeared that the trial court proceeded on the basis that testimony could proceed on the basis of a flat, lump-sum conclusory statement to be then subjected to cross-examination. After Smith had been cross-examined, Impala made a motion to strike his testimony on the grounds that "the conclusions were too speculative to merit submission to the jury as a basis for calculating damages," and that "there were assumptions made by the witness which were clearly unwarranted by testimony that has already established certain things as facts for it in this case. . . ." The court denied the motion to strike, on the merits, not on the ground that it was untimely. See Maryland Rule 522 d 2.

**15.** Cases involving the recovery of unrealized profits ordinarily fall into two district factual categories: (1) cases in which the injured party is the

the "certainty" rule had been modified into a more flexible one of "reasonable certainty." We explained:

"In such instances, recovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn. Generally, proof of actual or even estimated costs is all that is required with certainty.

"Some of the modifications which have been aimed at avoiding the harsh requirements of the 'certainty' rule include: (a) if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference; (b) where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty; (c) mere difficulty in ascertaining the amount of damage is not fatal; (d) mathematical precision in fixing the exact amount is not required; (e) it is sufficient if the best evidence of the damage which is available is produced; and (f) the plaintiff is entitled to recover the value of his contract as measured by the value of his profits. *McCormick, Damages,* Sec. 27 (1935). See also Note, *'Speculative Profits as Damages for Breach of Contract',* 46 Harv. L. Rev. 696 (1933), which states that 'the last hundred years have witnessed continual modification of the once rigid rule that anticipated profits, because inherently uncertain, were *per se* not a proper element of damages for breach of contract.' " *Id.* at 348-349.

---

seller of something and the defendant has breached his contract to buy, and (2) cases where the injured party is a buyer of something which he plans to resell, either directly, or as a middleman, or as a manufacturer, in a transaction collateral with a supplier. In the second category, where a buyer seeks recovery of collateral profits which he had lost, to meet the demands of the *certainty* rule, as distinguished from the *reasonable certainty* rule, more stringent proof of loss is required than is demanded of a seller. It is under the *certainty* rule, which Maryland does not now follow, that a buyer for resale must introduce detailed evidence of the number of sales lost, the prices which might have been obtained, and the costs of reselling. M & R Builders v. Michael, 215 Md. 340, 346, 138 A. 2d 350 (1958).

332

*See Macke Co. v. Pizza of Gaithersburg,* 259 Md. 479, 488-489, 270 A. 2d 645 (1970).[16] We have adopted and followed the "reasonable certainty" rule for proof of lost profits. *Auto. Retailers v. Evans Cig. Serv.,* 269 Md. 101, 109, 304 A. 2d 581 (1973); *St. Paul at Chase v. Mfrs. Life Insur.,* 262 Md. 192, 244-247, 278 A. 2d 12, *cert. denied,* 404 U. S. 857 (1971); *Macke Co. v. Pizza of Gaithersburg, supra,* 488-489; *Masano v. Albritton,* 245 Md. 423, 431, 226 A. 2d 299 (1967); *Feinberg v. Geo. Wash. Cemetery, Inc.,* 226 Md. 393, 399, 174 A. 2d 72 (1961); *McKeever v. Realty Corp.,* 183 Md. 216, 226, 37 A. 2d 305 (1944).

We have consistently recognized that "the admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal. *Produce Exchange v. Express Co.,* 147 Md. 424, 444, 128 A. 403, 411 (1925); *see, e.g., J. W. Berman Prop. v. Porter Bros.,* 276 Md. 1, 12-13, 344 A. 2d 65, 73 (1975); *Franceschina v. Hope,* 267 Md. 632, 636, 298 A. 2d 400, 403 (1973); *Air Lift, Ltd. v. Bd. of Co. Comm'rs,* [262 Md. 368, 401] 278 A. 2d [244 (1971)]. It is well settled in this State, however, that the trial court's determination is reviewable on appeal, *Refrigerating Co. v. Kreiner,* 109 Md. 361, 370, 71 A. 1066, 1070 (1909), and may be reversed if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion. *Balt., Ches. & Atl. Ry. Co. v. Moon,* 118 Md. 380, 392, 84 A. 536, 540 (1912); *see, e.g., Telak v. Maszczenski,* 248 Md. 476, 496-497, 237 A. 2d 434, 445 (1968); *Automobile Owners' Assn. v. State,* 154 Md. 204, 212, 140 A. 48, 51-52 (1928)." *Radman v. Harold,* 279 Md. 167, 173, 367 A. 2d 472 (1977). In *Air Lift, Ltd. v. Bd. of Co. Comm'rs, supra,* there was objection to the testimony of a police officer offered as an expert witness in regard to rock festivals or concerts. Part of the data on which he based his opinion was received by him from other identified law enforcement officers. He prepared written reports for his office in the regular course of his duties based upon what he and his office considered to

16. "Opinion evidence is that which is given by a person of ordinary capacity who has by opportunity acquired a particular knowledge outside of the limits of common observation." M & R Builders v. Michael, 215 Md. 340, 348, n. 2, 138 A. 2d 350 (1958).

be reliable information from law enforcement officials who were mentioned in the official publication of Law Enforcement Intelligence Units used throughout the United States and by some law enforcement units in Canada. We said:

> "The trustworthiness of the data would go to the weight of the expert testimony and does not, *per se,* make the expert testimony inadmissible. The competency of an expert to testify is largely within the discretion of the trial court; and, in the absence of an abuse of discretion, we will not disturb the trial court's ruling in this regard. See *e.g., Mondawmin Corp. v. Kres,* 258 Md. 307, 320, 266 A. 2d 8, 15 (1970) and *Continental Ins. Co. v. Kouwenhoven,* 242 Md. 115, 218 A. 2d 11 (1966)." 262 Md. at 401-402.

We see no abuse of discretion here in the admission of Smith's testimony, nor was the trial court's determination founded on an error of law or some serious mistake. Smith's appraisal of the present value of the loss of profits was within the guidelines of the reasonable certainty rule, and was properly admitted in evidence. *See generally* 22 Am. Jur. 2d *Damages* §§ 26, 29, 171-174, 178 (1965); Annot., 54 A.L.R. 3d 324 (1974); 5 Corbin on Contracts §§ 1020-1023 (1964).

*Constitutional Questions Presented*

Impala further contends that the awards of damages to CMI "infringed the foreign commerce and equal protection and due process clauses of the federal constitution." As we understand it, the argument on the question is bottomed in the main on premises that Impala did not breach the Agreement, nor was it guilty of fraud, and that it was not proper to have the action determined by a jury in any event. All this, it alleges, was a burden on commerce. It urges: "The actions of the trial court in upholding judgments which constitute burdens on commerce also amounted to impermissible denials of equal protection and due process." We are not persuaded to its position by the authorities it cites. We simply do not see where any federal constitutional questions are involved in the circumstances.

*The Judgment of Condemnation Absolute*

Our reversal of the judgment in favor of Impala against Sales renders the judgment of condemnation absolute against CMI as garnishee improper. We reverse it.

> *Judgment in favor of Impala Platinum Limited against Impala Sales (U.S.A.) Inc. reversed; judgment in favor of Colonial Metals, Inc. against Impala Platinum Limited affirmed; judgment of condemnation against Colonial Metals, Inc., garnishee, reversed; costs to be paid by Impala Platinum Limited.*